[No. A031921. First Dist. Div. Two. Aug. 17, 1987.]

BRITISH MOTOR CAR DISTRIBUTORS, LTD., Plaintiff and Respondent, v.
NEW MOTOR VEHICLE BOARD, Defendant and Appellant;
BRITISH MOTORS OF MONTEREY, INC., Real Party in Interest and Appellant.

**COUNSEL**

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Mary C. Michel and Lawrence J. Gumbiner, Deputy Attorneys General, for Defendant and Appellant.

Michele C. Kennedy, Andrew H. Swartz and Spiering & Swartz for Real Party in Interest and Appellant.

David C. Phillips, Goldstein & Phillips and Marvin E. Cardoza for Plaintiff and Respondent.

## OPINION

**SMITH, J.**—Real party in interest British Motors of Monterey, Inc. (British Motors) filed a protest with the California New Motor Vehicle Board (Board) over the termination of its franchise relationship with respondent British Motor Car Distributors, Ltd. dba Maserati Import Company (hereinafter Maserati). After an administrative hearing, the Board found that Maserati had terminated British Motors' dealership without just cause and ordered the franchise reinstated. The superior court granted Maserati's petition for writ of administrative mandamus and overturned the decision of the Board. We find none of the grounds cited by the trial court to be supportable and therefore reverse the judgment granting the writ.

### BACKGROUND

Maserati is a distributor of Maserati motor cars, headquartered in San Francisco. British Motors is a new car dealer in the City of Monterey, which sells multiple lines of foreign automobiles.

In June 1980 Maserati and British Motors entered into a standard form written franchise agreement under which the latter was appointed as a dealer of Maserati automobiles. The agreement was made effective until December 31, 1980. The contract provided that either party could terminate it upon giving the other party "not less than thirty (30) days' notice in writing." By letter from Maserati to British Motors, the dealer agreement was extended to December 31, 1981, again to June 30, 1982, and a third time to August 31, 1982.

By letter dated July 26, 1982, British Motors president Gerald Byrne notified Maserati that a new investor, Mr. Redding, would become a stockholder in British Motors, and requested a meeting "to formalize, with your approval, this arrangement." Maserati's president Kjell Qvale replied with a letter dated August 9, in which he reminded Byrne that the dealership agreement gave Maserati the right to terminate if any material change in the stock ownership of the franchise occurred. Qvale advised that Maserati would be contacting Byrne to arrange a meeting to discuss "your new arrangements as well as a reevaluation of your financial capability." During the latter part of August, a meeting took place between representatives of

both parties during which the change of ownership was discussed. Maserati's representatives gave no indication that Redding's ownership participation would be unsatisfactory.

By letter dated September 21, 1982, Qvale wrote to Byrne, stating, in pertinent part, as follows: "Dear Gerry: [¶] Your Dealer Agreement with Maserati Import Company expired on August 31, 1982. [¶] This is to inform you that we do not intend to renew your Agreement and hereby notify you that your termination will be effective 30 days from receipt of this letter."

In January 1984 British Motors filed a protest with the New Motor Vehicle Board. A hearing was held before an administrative law judge for the Board. The hearing officer found that British Motors franchise had been terminated on October 20, 1982, that the reasons for cancellation advanced by Maserati did not establish "good cause" for its termination or refusal to continue the British Motors franchise within the meaning of Vehicle Code section 3060 et seq.,[1] and that the protest should be upheld. The full Board adopted the findings of the administrative law judge and sustained the protest. No dealer members of the Board participated in the discussion of the case or the vote.

Pursuant to Code of Civil Procedure section 1094.5, Maserati filed a petition for writ of administrative mandamus in San Francisco Superior Court. After a hearing, the court issued a minute order which stated that, "[i]n its independent judgment the court finds that the board exceeded its jurisdiction." Its stated reasons were that (1) the franchise agreement had expired at the time of the purported termination, (2) the later "termination" was for "good cause" communicated by means other than the letter of termination, and (3) the composition of the Board was unconstitutional.

Both British Motors and the Board filed timely notices of appeal.

APPEAL

I

*The Constitutionality of the Board*

As noted above, the dealer members of the Board recused themselves from any discussion or participation in the resolution of the dispute before

---

[1] All further statutory references are to the Vehicle Code, unless otherwise indicated.

us. ■ Nevertheless, Maserati vigorously argues that the entire proceedings violated its due process rights because the mere presence of four new car dealers on the Board rendered any decision biased and therefore unconstitutional. The trial court apparently agreed. In order to assess this claim, it is necessary to briefly summarize the prior appellate decisions on this subject.

The New Motor Vehicle Board (formerly the New Car Dealers Policy and Appeals Board) was established, in its present form, in 1973. At the same time as it was renamed, the Legislature empowered the Board to resolve controversies between new car dealers and manufacturers under section 3060, which provides that no new car franchisor shall "terminate or refuse to continue any existing franchise" without reasons constituting "good cause" which, in most cases, must be communicated in writing to the franchisee and the Board at least 60 days prior to the termination or refusal to continue. (Stats. 1973, ch. 996, § 16, p. 1967, operative July 1, 1974; see *American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983, 986 [138 Cal.Rptr. 594].) Since the creation of the Board, the Legislature has required that four of its nine members shall be new car dealers. (§ 3001; see *Chevrolet Motor Division* v. *New Motor Vehicle Bd.* (1983) 146 Cal.App.3d 533, 536 [194 Cal.Rptr. 270].)

Unfortunately, enforcement of the machinery established for adjudicating grievances has been hampered by a kind of ongoing warfare between the courts and the Legislature over the presence of and nature of participation in the grievance procedure by dealer members of the Board.

In *American Motors Sales Corp.* v. *New Motor Vehicle Bd., supra,* 69 Cal.App.3d 983, the court held that the mandatory requirement that dealer members sit on the Board in dealer-manufacturer controversies and lack of any counterbalancing requirement that manufacturer members sit on the Board, deprived the manufacturer-litigants of due process in the adjudication of "good cause" disputes under section 3060 et seq. (*Id.*, at p. 992.) The court held that because dealer members inevitably have an economic stake in the outcome, such a "dealer-stacked" Board failed to comport with the constitutional requirement of a fair and impartial tribunal. (*Id.*, at pp. 987-991.)

In response to *American Motors,* the Legislature initially eliminated all dealer member involvement in termination disputes. (See Stats. 1977, ch. 278, §§ 2-3, pp. 1171-1173; *Chrysler Corp.* v. *New Motor Vehicle Bd.* (1979) 89 Cal.App.3d 1034, 1037 [153 Cal.Rptr. 135].) However, in response to strong lobbying efforts, the Legislature amended the statute in urgency

legislation to provide that dealer members "may *participate in, hear, and comment or advise* other members upon, *but may not decide*" any matter involving a dealer-manufacturer dispute. (Stats. 1979, ch. 340, § 2, subd. (d), p. 1207, italics added.) However, this amendment met a chilly reception by the courts in *Nissan Motor Corp.* v. *New Motor Vehicle Bd.* (1984) 153 Cal.App.3d 109 [202 Cal.Rptr. 1] and *Chevrolet Motor Division* v. *New Motor Vehicle Bd., supra,* 146 Cal.App.3d 533. Each of those decisions held that even though dealer members must stop short of actual voting on a dispute, their ability to "take part in every other aspect of the decisionmaking process, despite their financial interest in the outcome of that process" still rendered the statute constitutionally infirm. (*Nissan, supra,* 153 Cal.App.3d at p.115; *Chevrolet, supra,* 146 Cal.App.3d at p. 541.)

To comport with the *Nissan* and *Chevrolet* decisions, the Board, on its own, voluntarily began a policy of having all dealer members recuse themselves prior to any discussion of a grievance. (See *University Ford Chrysler-Plymouth, Inc.* v. *New Motor Vehicle Bd.* (1986) 179 Cal.App.3d 796, 804-805 [224 Cal.Rptr. 908].) Even this was insufficient to satisfy the appellate courts. In *University Ford Chrysler-Plymouth, Inc., supra,* the court of appeal held that the recusal policy, while "admirable" in its attempt to comply with constitutional due process requirements, did not cure the invalidity of the statute because it was contrary to the declared legislative intent that dealer members actively participate in the resolution of dealer-manufacturer disputes. (*Id.,* at p. 805.)

However, the Legislature has given the final word by amending the statute itself in 1985 to give its stamp of approval to the recusal policy. The statute in its present form now provides that "[a] member of the board who is a new motor vehicle dealer *may not participate in, hear, comment, or advise other members upon, or decide* any matter considered by the board" which involves a dispute between a dealer and a manufacturer. (Italics added.) (§ 3050, subds. (c), (d), as amended by Stats. 1985, ch. 1201, § 2; § 3066, subd. (d), as amended by Stats 1985, ch. 1566, § 2.)

In *American Isuzu Motors, Inc.* v. *New Motor Vehicle Bd.* (1986) 186 Cal.App.3d 464, the court held that this amendment cured the constitutional defects in the prior procedure and allows the Board to "act effectively to resolve dealer-manufacturer disputes." (*Id.,* at p. 471.)

Turning to the case at hand, it is clear from the record that the dealer members of the Board did not participate in any way in the adjudicatory process below. Thus, the practice followed here was free of the constitutional taint found in appellate decisions prior to *Isuzu.*

Nevertheless, Maserati argues that despite their nonparticipation in the grievance process, *merely by sitting on the Board* the dealer members influence and therefore unconstitutionally bias the public members who do decide dealer-manufacturer controversies. This precise contention was rejected in the *Isuzu* decision: "[Such a] challenge is not to the impartiality of the dealer members, whose financial interest has been recognized, but to the impartiality of the public members. Appellant offers no evidence of any financial interest these public members have in the outcome of the disputes, nor of any personal interest which would present a 'probability or likelihood of the existence of actual bias . . . so great that disqualification . . . is required to preserve the integrity of the legal system' . . . [Citation.] In the absence of any allegations of actual partiality, we find the simple interaction of the public members with the dealer members on other board business insufficient evidence of bias to overcome the presumption of honesty and integrity of adjudicators. [Citation.]" (186 Cal.App.3d at p. 473.) We agree with the *Isuzu* court that a claim of bias merely on the basis of interaction with dealer-members on unrelated matters is entirely too speculative to render the grievance procedure unconstitutional.[2] Because, in the proceedings below, the dealer members took no part in the decisionmaking process, they acted in a manner which was both constitutionally permissible and legislatively sanctioned. (*American Isuzu Motors, Inc.* v. *New Motor Vehicle Bd., supra,* 186 Cal.App.3d at pp. 470-471.) Accordingly, the trial court erred in determining that the composition of the Board provided constitutional grounds for overturning its decision.

## II

### *The Proper Standard of Review*

A second ground relied on by the trial court for its ruling was that Maserati had shown "good cause" for terminating British Motors. In doing so, the court expressly applied the "independent judgment" standard of review. ■ Maserati does not contend that the decision below lacked substantial evidence, but maintains that the trial court correctly applied the

---

[2] This conclusion is foreshadowed in the earlier decisions cited previously. Thus, in *American Motors Sales Corp.* v. *New Motor Vehicles Bd., supra,* the court took great pains to point out that it did *not* hold that car dealers were "per se constitutionally ineligible to sit on the Board." (69 Cal.App.3d at p. 992.) And in *Nissan Motor Corp.* v. *New Motor Vehicle Bd., supra,* the court, rather than simply reversing with directions to issue judgment in favor of the manufacturer, "remanded *for further proceedings before a Board acting without the participation of the new motor vehicle dealer members*" (153 Cal.App.3d at p.116, italics added), thereby implicitly sanctioning the constitutionality of a Board with dealer members who did not participate in the adjudicatory process.

independent judgment standard. British Motors and the Board argue that the substantial evidence test should have been applied.

■ In judicial review of administrative proceedings under Code of Civil Procedure section 1094.5, the test to be applied depends upon whether the administrative decision substantially affects a *fundamental vested* right. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481].) If it does, the trial court exercises its independent judgment upon the evidence; if not, its review is limited to whether the administrative decision is supported by substantial evidence in light of the whole record. (*Id.,* at pp. 143-144.)

It has been repeatedly held that the preservation of purely economic interests does not affect the fundamental vested rights of the petitioner. (*Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 22-23 [112 Cal.Rptr. 872]; *Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814]; *Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 273 [132 Cal.Rptr. 222].) ■ Accordingly, at least two prior reported cases have, without extended discussion, applied the substantial evidence test to review decisions of the New Motor Vehicle Board. (*American Isuzu Motors, Inc.* v. *New Motor Vehicle Bd., supra,* 186 Cal.App.3d at p. 474; *Piano* v. *New Motor Vehicle Bd.* (1980) 103 Cal.App.3d 412, 422 [163 Cal.Rptr. 41].) We see no reason to depart from that precedent. Maserati suggests, without citation of authority, that the Board's decision affects its "fundamental" right to choose its business affiliations, which is based upon freedom of contract and freedom of association. But both freedom to contract and freedom of association have long been subject to federal, state and local regulation in areas such as employment, housing, banking and insurance. It is far too late in the day to assert that a business enterprise has a "fundamental vested right" to conduct business free from reasonable governmental regulation. (See *Northern Inyo Hosp., supra,* 38 Cal.App.3d at p. 23; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court* (1968) 259 Cal.App.2d 306, 316 [66 Cal.Rptr. 183].)

We conclude that the trial court incorrectly applied the independent judgment standard in reviewing the Board's decision. ■ Moreover, the court's determination that Maserati had "good cause" to terminate the franchise was erroneous, regardless of which standard was applied.

Section 3060 prohibits termination or refusal to continue dealer franchises unless both the Board and the franchisee have, *60 days prior thereto,* received written notification of the action and *"setting forth the specific grounds for the termination or refusal to continue."* (§ 3060, subd. (a)(1), italics added.) It was undisputed that Maserati's notice to British Motors

stated no reasons for its action. A franchisor may not assert "good cause" for a franchise termination at the hearing on any ground not asserted in its notice of termination. (*American Isuzu Motors, Inc.* v. *New Motor Vehicle Bd. supra,* 186 Cal.App.3d at p. 477.) A fortiori, the trial court could not overturn the Board's decision based upon a finding of "good cause" for such termination, regardless of which standard of review it employed. Maserati's failure to comply with the notice requirements of section 3060, subdivision (a) was itself sufficient to establish adequate grounds for upholding British Motors' protest and sustaining the decision of the Board.

### III

### *The "Termination" Issue*

The most substantial ground which was relied upon by the court below in reversing the Board's decision was that the Board lacked jurisdiction over the dispute because British Motors' franchise had lapsed by its own terms prior to the purported "termination" of September 21, 1982.

The crucial language upon which this argument rests is that portion of section 3060 which states, in pertinent part: "*Notwithstanding . . . the terms of any franchise, no franchisor shall terminate or refuse to continue any existing franchise* unless all of the following conditions are met: . . ." (Italics added.) As Maserati correctly points out, the written dealer agreement between the parties was extended several times in writing through August 31, 1982, and contained no clause providing for renewal or automatic extension. Consequently, Maserati argues, there can be no wrongful "refusal to continue" an *existing* franchise because the franchise agreement had expired of its own force and effect. We cannot accept Maserati's argument.

Even though the parties may not have *expressly* agreed to extend the dealer agreement past August 31, 1982, such an extension may be implied from their conduct and the surrounding circumstances. (Civ. Code, §§ 1619, 1621; 1 Corbin on Contracts (1963) § 18, p. 43; see *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 678, fn. 16; *Consolidated Theaters, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 725 [73 Cal.Rptr. 213, 447 P.2d 325].) Whether the conduct of the parties manifested such an agreement is ordinarily an issue for the trier of fact. (*Caron* v. *Andrew* (1955) 133 Cal.App.2d 412, 416 [284 P.2d 550].)

In the case at bar, the administrative hearing officer (and by adoption, the Board) found that Maserati had *terminated* the franchise agree-

ment on October 20, 1982. Implicit in such a finding was a finding that the parties, by their conduct, manifested an agreement to continue the franchise beyond August 31. The evidence in support of this determination was overwhelming. Maserati's president, Mr. Qvale, repeatedly testified that he had determined to "terminate" or "cancel" the British Motors dealership. The September 21 letter which Qvale wrote to Byrne advises that "we . . . hereby notify you that your *termination* will be effective 30 days from receipt of this letter." (Italics added.) This language is an undisguised attempt to comply with that provision of the contract which requires at least 30 days written notice for *termination* of the agreement. Finally, Maserati wrote to the Occupational Licensing Division of the Department of Motor Vehicles, advising that British Motors' *"termination* is effective October 21, 1982."

■ In reviewing the administrative decision, the trial court was required to perform essentially an appellate function—to determine whether the Board's decision was an abuse of discretion, an abuse which is established by a lack of substantial evidence. (Code Civ. Proc. § 1094.5, subd. (c); *American Isuzu Motors, Inc.* v. *New Motor Vehicle Bd., supra,* 186 Cal.App.3d at p. 474.) The court was not empowered to reweigh the evidence, take into account evidence which detracts from the weight of other evidence supporting the decision, or draw inferences different from those which could reasonably be drawn by the Board. (*Flowers* v. *State Personnel Bd.* (1985) 174 Cal.App.3d 753, 758-759 [220 Cal.Rptr 139].) ■ Since the Board's finding that the British Motors franchise was "terminated" rather than simply allowed to lapse was supported by substantial, and indeed rather convincing evidence in the record, the trial judge's "finding" to the contrary exceeded the proper scope of its review. We therefore find insupportable the third and final ground relied upon by the superior court for granting the writ.

In light of this conclusion, appellants' other contentions that section 3060 was intended to apply even to expired franchise agreements and that Maserati should be estopped from contending that the franchise lapsed, are moot.

### IV

#### *Timeliness of the Protest*

■ Maserati also asserts that the decision of the superior court should be affirmed because the protest filed by British Motors was untimely. The trial court did not rely upon this ground as a basis for its decision; however, because the trial and appellate courts occupy identical positions with respect to the review of the administrative decision below (*American Isuzu*

*Motors, Inc.* v. *New Motor Vehicle Bd., supra,* 186 Cal.App.3d at p. 474), it is necessary to address this contention.

Although Maserati terminated the British Motors franchise in October 1982, British Motors did not file a protest until January 1984. Maserati then filed a motion to dismiss the protest on grounds of untimeliness, which was denied by the Board. The issue before us is whether that determination was supported by substantial evidence.

Subdivision (b) of section 3060 provides that the franchisee may file a protest with the Board within "30 days after receiving a 60-day notice or within 10 days after receiving a 15-day notice" *as prescribed in subdivision (a)* of that section. As noted previously, Maserati's termination letter failed to comply with the "statement of reasons" requirement or the 60-day prior notice requirement set forth in subdivision (a). More importantly, the evidence shows that no notice of termination was sent to *the Board*, as subdivision (a) also requires.[3] Accordingly, the hearing officer overruled Maserati's timeliness objection.

This ruling did not constitute an abuse of discretion. Under the language of the statute, no franchise may be terminated until *both* the proper notices have been sent *and* the appropriate period for filing a protest has lapsed. The limitations period of section 3060, subdivision (b) is thus expressly dependent upon the franchisor first complying with the notice provisions of subdivision (a). Any other interpretation of the statute would reward franchisors who send out defective notices.

Since Maserati failed to comply with either the 60-day prior notice or the "statement of reasons" provisions of section 3060, subdivision (a), it failed to trigger the running of the limitations period. Maserati argues that even if it did not strictly comply with the statute, the lapse of more than one year from the date of termination to the date of protest was so "unreasonable" as to deny it due process of law. However, the only authority cited in support of this argument, *Garcia* v. *Los Angeles County Bd. of Education* (1981) 123 Cal.App.3d 807 [177 Cal.Rptr. 29], holds that procedural safeguards established by the Legislature for prompt hearings in disciplinary proceedings are intended to protect the due process rights of the accused. (*Id.,* at p. 812.) Here, the Legislature has prescribed a procedure of which franchisors may avail themselves in discontinuing franchise relationships. Such procedures were part of its declared overall purpose of "avoid[ing] undue control of the independent new motor vehicle dealer by the vehicle manufacturer. . . ."

---

[3] The only communication which Maserati sent to a third party was a one-line letter to the Occupational *Licensing* Division of the DMV, an agency not related to the New Motor Vehicle Board.

(Stats. 1973, ch. 996, § 1.) Had Maserati complied with the statutorily mandated notice requirements, it would have achieved a swift and expeditious resolution of the propriety of its actions. It is hardly in a position to complain of due process deprivation due to delay caused by its own misfeasance.[4]

## DISPOSITION

The judgment of the superior court is reversed with directions to enter judgment in favor of the Board and real party in interest British Motors.

Kline, P. J., and Rouse, J., concurred.

On September 10, 1987, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied November 10, 1987.

---

[4] An entirely plausible explanation offered by British Motors for the delay in filing the protest illustrates why compliance with subdivision (a) of section 3060 should be required to start the running of the statute.

After receiving the "Dear Gerry" letter of September 21, British Motors spent several months negotiating with Maserati in an attempt to persuade it to continue the franchise. In the meantime, British Motors's attorneys kept in contact with the Board, which assured them that no termination notice had been filed. British Motors therefore believed that there was no danger of untimely filing, since under section 3060 there was no way of measuring the timeliness of the protest until a termination letter was filed with the Board, a belief to which the Board's administrator lent credence in discussing the matter with them.

If this were a case where the manufacturer had notified the Board of the termination but the notice were somehow technically defective, we might pause to consider the result reached by the Board. Here however, we are dealing with a situation where the Board never even *receives* notice and the franchisee reasonably relies upon the wording of a statute which says the limitations period is not triggered until such receipt. We would be turning the doctrine of laches upside down to hold that the party in noncompliance with the plain wording of a statute has a superior equity to one who reads, and reasonably relies upon, such wording.