[No. H028762. Sixth Dist. Aug. 22, 2006.]

JKH ENTERPRISES, INC., Plaintiff and Appellant, v.
DEPARTMENT OF INDUSTRIAL RELATIONS, Defendant and
Respondent.

## COUNSEL

Sims & Layton and Rona Page Layton for Plaintiff and Appellant.

David M. Balter for Defendant and Respondent.

## OPINION

**DUFFY, J.**—This is an appeal by JKH Enterprises, Inc., doing business as AAA Courier, from the trial court's denial of its petition for a writ of administrative mandamus. JKH provides courier services to Bay Area businesses such as title companies and law firms. JKH filed the petition for writ in an effort to overturn the administrative stop work order issued and upheld by the Department of Industrial Relations (Department), respondent here. The stop work order and penalty were based on the Department's conclusion that JKH's drivers who accomplish the actual delivery services on its behalf are properly classified as employees, as opposed to independent contractors as JKH had characterized them, and that JKH had failed to procure workers' compensation insurance for their benefit in violation of Labor Code section 3700. The penalty ultimately assessed by the Department under Labor Code section 3722 was $15,000—$1,000 for each working driver classified as an employee on the day that the stop work order was issued.

Based on the administrative record and the deferential standard of judicial review that governs our analysis, we conclude that JKH has not demonstrated that the Department abused its discretion and we accordingly affirm the trial court's order.

## STATEMENT OF THE CASE

### I. *Factual Background*[1]

JKH is a corporation. Its president is Joe K. Herrera. Herrera, as a sole proprietor, previously owned and operated a separate courier service business called VIP Courier. VIP also became subject to a similar stop order issued by the Department for the failure of that business to have procured workers' compensation insurance for its delivery drivers. VIP did not challenge the stop order but Herrera then incorporated as JKH, which then internally classified its drivers as independent contractors. But the nature of JKH's business—delivery services—was not different from that of VIP's.

Prior to their engagement by JKH, each of the drivers filled out a form entitled "Independent Contractor Profile" and an application in which the driver acknowledged his or her status as an independent contractor and provided his or her own automobile insurance information.[2] Once engaged by JKH, the drivers perform their work by picking up the delivery items from JKH's customers and delivering the packages to the designated locations. Although according to Herrera, the courier industry suffers a high driver turnover rate, some of JKH's drivers have maintained their working relationships with JKH for as much as several years.

The drivers are divided into two categories—"route" and "special." The route drivers regularly service the same route or territory and are paid a negotiated amount per hour depending on the mileage, time, and volume of deliveries usually involved in the particular route.[3] The route drivers are not required to contact JKH's dispatcher on a regular basis because in the course of servicing the regular routes, they pick up the packages from JKH's route customers and are directed by the customer where and when to deliver the packages. But the route drivers themselves decide how best to cover their particular territories. JKH only learns of the route drivers' particular deliveries the next day through their "document registers." JKH's route customers

---

[1] The factual background is derived entirely from the contents of the administrative record, which defines the scope of our review. The record on appeal contains additional matters, including the petition for writ.

[2] The forms are on the letterhead of an entity entitled "Contractor Management Services," which apparently has nothing to do with JKH, and neither JKH nor AAA is mentioned on them. Although the drivers acknowledged their independent contractor status on the forms, there appears to be no actual written agreement between JKH and any of its drivers concerning the drivers' status as either employees or independent contractors.

[3] The record is clear that drivers who are assigned to particular customers, which we assume are route as opposed to special drivers, are paid by the hour. But the record also references route drivers as having negotiated set *monthly* payments. We resolve this evidentiary conflict in favor of the decision below, that is that the route drivers are paid by the hour.

also provide the company, for billing purposes, with information about the particular driver's time involved with respect to that customer's deliveries.

The special drivers, by contrast, perform the work of the "special" deliveries requested by JKH's customers on any given day. Each special driver is supposed to call JKH's dispatcher, usually on his or her own cell phone, each day to inform the dispatcher whether he or she wishes to work that day. Having communicated their availability to work on a given day, the special drivers then receive information from the dispatcher about where packages are to be picked up from JKH's customers for delivery. But the drivers are free to decline to perform a particular delivery when contacted by the dispatcher, even if the driver has indicated his or her availability for the day. The special drivers are not required to work either at all or on any particular schedule. They are paid by individually negotiated commissions based on the deliveries that they do.

Other than to satisfy the general assurances given by JKH to its customers that their packages will reach the appropriate local destination within two to four hours from pickup, the special drivers, like the route drivers, are not governed by particular rules and they do not receive direction from JKH about how to perform the delivery task or what driving routes to take. Sometimes when a route driver completes a day's deliveries for a particular route, he or she will call into the dispatcher to inform that he or she is then available to deliver "specials" so as to earn extra money.

All drivers, whether route or special, use their own vehicles to make the deliveries. They pay for their own gas, car service and maintenance, and insurance. They use their own cell phones for the most part to communicate with JKH.[4] The drivers' cars do not bear any JKH marking or logo. And the drivers themselves do not wear uniforms or badges that evidence their affiliation or relationship with JKH. Some of the drivers perform delivery services for other companies as well. Two of the drivers have their own business licenses and provide the delivery services on behalf of their own businesses, only one of which is itself a delivery service. The drivers receive no particular training, other than brief instruction on how to fill out the log sheets that verify customer deliveries and show the locations of pickups and deliveries.

---

[4] JKH has equipped some drivers with radios but most of the drivers use their own cell phones anyway.

All drivers set their own schedules and choose their own driving routes. Their work is not supervised. Indeed, JKH only has a vague idea of where its working drivers are during the business day. They are never required to report to the location of JKH's business office, and Joe Herrera has never met some of them. The drivers take time off when they want to and they are not required to ask for permission in order to do so. If not enough drivers are available to work on a given day, Joe Herrera, members of his family, and even JKH's dispatcher fill in to perform JKH's deliveries.

The drivers are paid twice a month, with no deductions taken, and they are each annually issued a federal tax form 1099 rather than a W2.[5] They are provided no benefits. According to Joe Herrera, the drivers consider themselves to be independent contractors. The drivers turn in their delivery logs and JKH keeps track of those in order to bill its customers. But the drivers do not fill out or turn in any time sheets. Instead, JKH charges its route customers a fee, from which it pays the route drivers their negotiated hourly fee, derived from hourly figures provided to JKH by its route customers. For special deliveries, JKH charges a fee to its customer and then generally splits that amount with the special driver who performed that particular delivery.

## II. Procedural Background

### A. Proceedings Before the Department

On September 8, 2004, Benny Cheng, a Deputy Labor Commissioner for the Department, conducted an inspection at JKH's offices. Joe Herrera was not present at JKH's offices at the time of the inspection so Cheng initially spoke with the dispatcher, who then called Herrera. Cheng spoke with Herrera on the phone and asked if JKH's employees were covered by a policy of workers' compensation insurance. Herrera replied that all of JKH's drivers were independent contractors and JKH was therefore not required to and did not provide such insurance. Cheng asked the dispatcher for a list of the names of drivers then working for JKH, which the dispatcher provided.

Cheng asked the dispatcher some questions such as how often the drivers were paid, but the dispatcher either was reluctant to answer or did not have the information. The dispatcher did tell Cheng that he relayed information to the (special) drivers about where to pick up the delivery packages from JKH's customers. From this, Cheng concluded that the drivers were making

---

[5] This is in contrast to the dispatcher, who is classified as a salaried employee and who is also an officer of the corporation.

the deliveries for the company, thus performing the actual work of its day-to-day business, and that they were under its general control in doing so. This conclusion, in turn, led Cheng to the further conclusion that JKH was using employee labor and that the drivers were not actually functioning as independent contractors but as employees, which prompted Cheng to issue the "Stop Order—Penalty Assessment" under Labor Code section 3700 that day. A penalty of $16,000 was initially calculated under Labor Code section 3722 based on a fine of $1,000 for each of the 16 driver-employees determined by Cheng to be working for JKH on that day.

The next day, Cheng issued and served a document subpoena on JKH. The subpoena sought, among other things, documents concerning the names and addresses of the drivers, time records, billing records, and cancelled paychecks. JKH produced responsive documents about a week later. Among the documents produced were the "Independent Contractor Profiles" and form applications that had been filled out by the drivers, along with lists showing the amounts paid by JKH to the drivers during the three pay periods immediately preceding the issuance of the stop order and cancelled checks. Cheng spoke with Herrera about the document production and Herrera maintained that consistently with industry standard, the drivers were independent contractors and for this reason, JKH was not required to procure a policy of workers' compensation insurance for their benefit.

JKH contested the "Stop Order—Penalty Assessment" and requested a hearing before the Department. In the request for hearing, Herrera stated his belief that JKH was not required to provide a policy of workers' compensation insurance. Both Cheng and Herrera spoke at the hearing.[6] After the presentations by both sides, the hearing officer said that she would take a recess to review all the information presented. Before doing so, the hearing officer said that she knew that drivers of other similarly organized delivery services had been found by the Department to be employees, and that she did not know that she would find any differently with respect to JKH. After taking the recess, the hearing officer returned and announced her decision to uphold the stop order and her intention to issue a written decision.

The written decision upholding the order included factual findings, which, in essence, reflected the facts stated above. The hearing officer ultimately found that on those facts, the drivers were properly classified as employees rather than independent contractors. While the decision states that there is no

---

[6] And a transcript of it was prepared, which forms a part of the administrative record on this appeal.

single determinative factor in the determination of whether a worker is an employee or independent contractor, it reached the conclusion in this case that the drivers were employees by applying the "multi-factor" or "economic realities" test enunciated in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*).

The hearing officer's decision stated: "Although some of the factors in this case can be indicative of the workers being independent contractors, the overriding factor is that the persons performing the work are not engaged in occupations or businesses distinct from that of [JKH]. Rather, their work is the basis for [JKH's] business. [JKH] obtains the clients who are in need of delivery services and provides the workers who conduct the service on behalf of [JKH]. In addition, even though there is an absence of control over the details, an employee-employer relationship will be found if the [principal] retains pervasive control over the operation as a whole, the worker's duties are an integral part of the operation, and the nature of the work makes detailed control unnecessary. (*Yellow Cab Cooperative v. Workers' Compensation Appeals Board* (1991) 226 Cal.App.3d 1288 [277 Cal.Rptr. 434]). Therefore, the finding is that these workers are in fact employees of [JKH]."

The decision thus upheld the stop order and penalty assessment, which it reduced by $1,000 for the one driver who was conducting a delivery business under a separate business license. With respect to this driver, the decision acknowledged that employee status might be incorrect.[7]

### B. *Proceedings Before the Trial Court*

JKH timely petitioned in the trial court for a writ of administrative mandate under Code of Civil Procedure section 1094.5. It also sought a stay of the stop order. The trial court issued an alternative writ. The Department, for its part, sought a restraining order, which the trial court granted, as well as preliminary and permanent injunctions enforcing the previously issued stop work order.

---

[7] As JKH points out, it is not clear why the delivery service business license possessed by this one driver alone made a critical difference in the hearing officer's decision to categorize that driver as an independent contractor when the functionality of the work performed by the driver in relation to JKH's business was the same as that of the other drivers. But giving the decision the deference to which it is entitled, this question does not affect our analysis of whether there is substantial evidence in the record to support the employee determination with respect to the other drivers.

The court held a hearing, and then issued its order denying JKH's petition for writ of mandate and granting a preliminary injunction enforcing the stop work order. The order reflects that the trial court reviewed the decision of the Department under the substantial evidence, as opposed to the independent judgment, standard of judicial review. In doing so, the court rejected JKH's contention that it was entitled to the more favorable independent judgment standard since, it argued, the Department's decision upholding the stop work order impaired its fundamental vested right to continue doing business in the manner in which it had.[8]

In affirming the decision, the court concluded that there was substantial evidence in the record of the cited *Borello* factors to support the determination that the drivers were employees. The court also found that like *Borello*, the question of employee versus independent contractor status in this case was being made in the context of the employer's obligation under the law to provide workers' compensation insurance—a legislated social policy distinct from the tort concepts at play in cases relied on by JKH. The court observed that in this setting, under *Borello*, employment is defined broadly and there is "a general presumption that any person 'in service to another' is a covered 'employee.' " (*Borello, supra*, 48 Cal.3d at p. 354.) The court also relied on *Borello* in finding that the need to avoid subterfuge in the classification of workers as independent contractors was invoked here since the formation of the corporate entity JKH and the independent contractor "agreements" signed by its drivers had been in response to a previous citation issued to VIP Courier for the same failure to have provided workers' compensation insurance.

---

[8] In support of its petition, JKH filed a declaration of Joe Herrera a few days before the hearing. In the declaration, Herrera averred not only that it was courier industry standard to classify drivers as independent contractors but also that if the stop order were upheld, JKH "will be unable to compete against the other courier companies whose drivers are independent contractors, and who do not have the additional costs associated with employee labor." This declaration evidences an effort to elevate the applicable standard of judicial review in the trial court from substantial evidence to independent judgment by establishing that JKH had been singled out by the Department and that the stop order affected its fundamental vested right to conduct its business and compete with other courier businesses not operating under the same burden. The Department objected to consideration of the declaration as being outside the administrative record, among other grounds. And the trial court apparently did not consider it, stating its view that to do so would be inappropriate. We agree that absent exceptions not established here, judicial review of adjudicative administrative orders is limited to consideration of the contents of the administrative record. (*Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 920 [8 Cal.Rptr.3d 178]; *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 118 [99 Cal.Rptr.2d 378]; *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1594 [45 Cal.Rptr.2d 822].) We accordingly also decline to consider this declaration.

This appeal followed.

## DISCUSSION

### I. *Appealability and Standard of Review*

#### A. *Appealability*

Ordinarily, an appeal must be taken only from a final judgment, even in a mandamus action. (Code Civ. Proc., § 904.1; *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697 [107 Cal.Rptr.2d 149, 23 P.3d 43]; *Hadley v. Superior Court* (1972) 29 Cal.App.3d 389, 394 [105 Cal.Rptr. 500]; *Old Town Dev. Corp. v. Urban Renewal Agency* (1967) 249 Cal.App.2d 313, 317 [57 Cal.Rptr. 426] [dismissing appeal of minute order granting motion for judgment on the pleadings in mandamus action but deciding case on appeal from judgment].) However, there is also case law to the effect that an order denying a petition for writ of mandamus that effectively disposes of the action because no issues remain to be determined is also appealable. (*Bollengier v. Doctors Medical Center* (1990) 222 Cal.App.3d 1115, 1122 [272 Cal.Rptr. 273]; *MCM Construction, Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 367, fn. 3 [78 Cal.Rptr.2d 44].)

Here, there is no formal judgment in the record, but the order denying the petition for writ appears to have terminated the trial court proceedings. Although the Department had also prayed for a permanent injunction enforcing the stop work order, there is nothing in the record indicating that it ever intended to pursue this relief. Moreover, the court's order granted the Department's request for a preliminary injunction, which is itself separately appealable under Code of Civil Procedure section 904.1, subdivision (a)(6). And in order to address the merits of the preliminary injunction, it is necessary for us at the threshold to address the merits of the underlying denial of JKH's petition for writ, on which the injunction rests. Accordingly, we will treat the entire order as appealable.

#### B. *Standard of Review*

Where, as here, it is claimed that a public agency abused its discretion because its findings are not supported by the evidence, a superior court's review of an agency's adjudicatory[9] administrative decision under Code of

---

[9] In the context of appeals from public agency decisions, an adjudicatory or quasi-judicial decision affects the rights of a specific individual or entity and it is reviewed by administrative mandate under Code of Civil Procedure section 1094.5. The decision must have resulted from a proceeding in which a hearing is required, evidence is taken, and discretion in the determination of facts is given to the agency. (*McGill v. Regents of University of California*

Civil Procedure section 1094.5 is subject to two possible standards depending on the nature of the rights involved.[10] (*Mann v. Department of Motor Vehicles* (1999) 76 Cal.App.4th 312, 320 [90 Cal.Rptr.2d 277].) If the administrative decision involved or substantially affected a "fundamental vested right," the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–144 [93 Cal.Rptr. 234, 481 P.2d 242] (*Bixby*); Code Civ. Proc., § 1094.5, subd. (c).) The theory behind this kind of review is that abrogation of a fundamental vested right "is too important to the individual to relegate it to exclusive administrative extinction." (*Bixby, supra*, at p. 144.)

Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record. (*Bixby, supra*, 4 Cal.3d at pp. 143–144.) Substantial evidence, of course, must be " 'of ponderable legal significance,' " which is reasonable in nature, credible and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191]; see *Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 305, fn. 28 [58 Cal.Rptr.2d 721].)

---

(1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466].) A nonadjudicatory or quasi-legislative decision, by contrast, adopts a rule, regulation, or policy decision of general application and is reviewed by ordinary mandate under Code of Civil Procedure section 1085. (44 Cal.App.4th at p. 1785.)

[10] Under Code of Civil Procedure section 1094.5, the inquiry "shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)

This language does not attempt to specify which cases are reviewable under which standard. "The sole legislative guidance on this point is that the courts may independently weigh the evidence whenever 'authorized by law' to do so. In using this language, the Legislature simply intended to codify existing rules governing the applicable standard of judicial review. [Citation.] In other words, the courts are left with the ultimate task of deciding which cases warrant such review. [Citations.]" (*County of Alameda v. Board of Retirement* (1988) 46 Cal.3d 902, 906 [251 Cal.Rptr. 267, 760 P.2d 464].)

Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard. (*Fukada v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693]; *Bixby, supra,* 4 Cal.3d at pp. 143–144.) But depending on whether the trial court exercised independent judgment or applied the substantial evidence test, the appellate court will review the record to determine whether either the trial court's judgment or the agency's findings, respectively, are supported by substantial evidence. (*Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at p. 1590.) If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. (*Bixby, supra,* at pp. 143–144; *County of Alameda v. Board of Retirement, supra,* 46 Cal.3d at p. 910.) On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them.[11] (*MHC Operating Limited Partnership v. City of San Jose, supra,* 106 Cal.App.4th at pp. 217–220; *Young v. Gannon* (2002) 97 Cal.App.4th 209, 225 [118 Cal.Rptr.2d 187].)

If the administrative findings are supported by substantial evidence, the next question is one of law—whether those findings support the agency's

---

[11] There are some general exceptions to this, none of which are applicable here. For example, pure issues of law are always subject to independent appellate court review. (*Stermer v. Board of Dental Examiners* (2002) 95 Cal.App.4th 128, 132–133 [115 Cal.Rptr.2d 294]; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219 [130 Cal.Rptr.2d 564] [hearing officer's interpretation of ordinance was subject to de novo appellate review but was still entitled to deference]; *Garamendi v. Mission Ins. Co.* (2005) 131 Cal.App.4th 30, 41 [31 Cal.Rptr.3d 395] [" ' "It is for the courts, not for administrative agencies, to lay down the governing principles of law" ' "].) In this appeal, JKH has raised no pure issues of law, challenging only the agency's finding of employment and asserting that this finding is not supported by the evidence.

Additionally, when the issue on review concerns the nature or degree of an administrative penalty, the appellate court reviews the penalty de novo to determine whether the agency abused its discretion. (*California Real Estate Loans, Inc. v. Wallace* (1993) 18 Cal.App.4th 1575, 1580 [23 Cal.Rptr.2d 462].) "[N]either a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed." (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204–205 [99 Cal.Rptr.2d 357].) This standard is not in play here since JKH has raised no particular argument about the nature or degree of the penalty imposed against it. It has instead challenged only on the basis of the finding of employee status that resulted in the $15,000 penalty assessed by the Department.

legal conclusions or its ultimate determination. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) If the administrative record reveals the theory upon which the agency has arrived at its ultimate decision, the decision should be upheld so long as the agency found those facts that as a matter of law are essential to sustain the decision. (*Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880, 884–885 [96 Cal.Rptr.2d 538].)

## II. *Analysis*

### A. *The Trial Court Applied the Correct Standard of Judicial Review*

The parties devote a significant part of their briefing to the question of the proper standard of judicial review. JKH contends that the trial court erred by reviewing the Department's decision under the substantial evidence standard. This claim rests on JKH's assertion that the Department's decision affected a fundamental vested right entitling JKH to the benefit of the trial court's independent judgment on review of the decision.[12] The trial court rejected this contention, and so do we.

The determination whether a right is fundamental and vested for purposes of ascertaining the appropriate standard of judicial review in an adjudicative administrative mandamus action is made on a case-by-case basis. (*Bixby, supra,* 4 Cal.3d at p. 144.) A right is deemed fundamental "on either or both of two bases: (1) the character and quality of its economic aspect; [or] (2) the character and quality of its human aspect." (*Interstate Brands v. Unemployment Ins. Appeals Board* (1980) 26 Cal.3d 770, 780 [163 Cal.Rptr. 619, 608 P.2d 707].) "The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power." (*Id.* at. p. 779, fn. 5.) "In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Bixby, supra,* 4 Cal.3d at p. 144.) In other words, we look to the nature of the right involved as opposed to the amount of harm or economic injury sustained.

---

[12] JKH abandoned this claim at oral argument, conceding that the proper standard of judicial review in this case is the substantial evidence test. We analyze this issue nonetheless, given its obvious significance in the briefing.

■ Courts have interpreted fundamental vested rights to include individual rights guaranteed under the due process and equal protection clauses of the state and federal Constitutions. (*County of Alameda v. Board of Retirement, supra*, 46 Cal.3d at p. 907.) A fundamental right may also be vested by statute. (*Kerrigan v. Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 51 [154 Cal.Rptr. 29] [statutory right to be free from age discrimination in seeking employment is vested].) Fundamental vested rights also include matters which " 'although not involving vested property rights in the traditional sense, nevertheless had [a significant] impact on the individual . . . .' [Citations.]" (*County of Alameda v. Board of Retirement, supra*, 46 Cal.3d at p. 907.) In determining whether a right is a fundamental vested right, courts may also refer to documents that are the source of the right such as a collective bargaining agreement or other contract. (*San Bernardino Public Employees Assn. v. City of Fontana* (1998) 67 Cal.App.4th 1215, 1223 [79 Cal.Rptr.2d 634].) In addition, the concepts of "fundamental" and "vestedness" are interrelated such that courts will examine the extent to which a right is vested, i.e., legitimately acquired or already possessed by the individual, in determining whether it is fundamental. (*Bixby, supra*, 4 Cal.3d at pp. 144, 146.) "A 'fundamental vested right' has been defined in terms of a contrast between a right possessed and one that is merely sought. [Citation.] ' "The term 'vested' denotes a right that is either 'already possessed' [citation] or 'legitimately acquired' [citation]." ' " (*Mann v. Department of Motor Vehicles, supra*, 76 Cal.App.4th at p. 320.)

■ Even though the fundamental vested right determination is made on a case-by-case basis, as a general rule, when a case involves or affects purely economic interests, courts are far less likely to find a right to be of the fundamental vested character. (*Kawasaki Motors Corp. v. Superior Court* (2000) 85 Cal.App.4th 200, 204 [101 Cal.Rptr.2d 863] [protest of termination of automotive dealer franchise reviewed under substantial evidence test]; *301 Ocean Ave. Corp. v. Santa Monica Rent Control Bd.* (1991) 228 Cal.App.3d 1548, 1556 [279 Cal.Rptr. 636] [decision of rent control board reviewed under substantial evidence test]; *British Motor Car Distributors, Ltd. v. New Motor Vehicle Bd.* (1987) 194 Cal.App.3d 81, 90 [239 Cal.Rptr. 280]; *San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos* (1987) 192 Cal.App.3d 1492, 1500 [238 Cal.Rptr. 290] [proposed rent increases reviewed under substantial evidence test]; *Standard Oil Co. v. Feldstein* (1980) 105 Cal.App.3d 590, 604–605 [164 Cal.Rptr. 403] [no fundamental right to operate four rather than three refinery units even though return on investment may be lower]; *Northern Inyo Hosp. v. Fair Emp. Practice Com.* (1974) 38

Cal.App.3d 14, 22–23 [112 Cal.Rptr. 872]; *Mobil Oil Corp. v. Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814] [no fundamental right to release gasoline vapors while dispensing fuel to customers and requirement of vapor recovery systems reviewed under substantial evidence test].) "Administrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests, rather than on fundamental vested rights." (*E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325, 326–327 [65 Cal.Rptr.2d 325] [restrictions on the hours of operation of an "adult" bookstore had purely economic effect such that substantial evidence was proper standard of review applied by the trial court].)

JKH relies exclusively on *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519 [8 Cal.Rptr.2d 385] (*Goat Hill Tavern*), in support of its contention that the Department's decision affected a fundamental vested right—to continue operating an existing delivery business in the same manner without providing a policy of workers' compensation for the benefit of its drivers. *Goat Hill Tavern* involved a city's discretionary refusal to renew a conditional use permit after the business and property owner had invested over $1 million in improvements. The business had operated at the same location under an existing permit for decades and was established prior to the enactment of the particular zoning restrictions. The intended goals of the city's decision not to renew the use permit were to shut down the business and to deprive the owner of the existing use of his property. The court of appeal therefore concluded, on those "unique facts," that the affected right was fundamental and vested. (*Goat Hill Tavern, supra,* at p. 1529.)

By contrast, the instant case involves agency regulation of labor relations and the enforcement of legislated social policies—a very different setting. And there are no real property interests involved. Moreover, the purpose of the decision was to impose JKH's compliance with the law as a condition of doing business, not to put it out of business. On that note, there is no evidence in the administrative record here that JKH's compliance with Labor Code section 3700 by providing workers' compensation insurance for its drivers would have effectively shut down its business.[13] Even if this were the case, the continued operation of a business in a manner that violates the applicable regulatory scheme governing all employers is not a fundamental vested right or one that was legitimately acquired. It is true that requiring

---

[13] See footnote 8, *ante,* regarding the inadmissible declaration of Joe Herrera that JKH offered in the trial court.

JKH to purchase workers' compensation insurance would mean that it would have to incur an expense, and that this expense would cause an increase in the cost of doing business and potentially a decrease in profits. But this result would affect a purely economic interest and would not involve or affect a right that is fundamental and vested under *Bixby* and its progeny.

Accordingly, we find that the impact of the Department's decision on JKH's business was purely economic, and conclude as a result that the trial court properly applied the substantial evidence test. We therefore review the Department's decision and its findings under the same standard to determine whether, in light of the whole administrative record, they are supported.

### B. *The Department's Findings and Order Are Supported by Substantial Evidence*

Under the substantial evidence test, the agency's findings are presumed to be supported by the administrative record and the appellant challenging them has the burden to show that they are not. (*Mann v. Department of Motor Vehicles, supra,* 76 Cal.App.4th at p. 318.) We conclude that JKH has not met this burden.

The ultimate finding by the hearing officer in this case was that JKH's drivers, as an unskilled but integral part of its business, were functioning as employees rather than independent contractors, and, thus, JKH was required to comply with Labor Code section 3700 by providing the drivers with workers' compensation coverage. The decision cited *Borello, supra,* 48 Cal.3d 341, as primary support for this conclusion.

█ The California Supreme Court decided *Borello* in 1989, and it remains the seminal case with respect to the determination whether a hiree is an employee or independent contractor for purposes of the requirement of an employer to provide workers' compensation insurance. The court made several authoritative pronouncements in the case. First, the court made clear that while the common law emphasis on the hirer's degree of control over the details of the work in the determination of an employment relationship remains significant, it is not the only factor to be considered in the workers' compensation context. This is because the question of a hiree's status must be considered in light of the history and remedial and social purposes of the Workers' Compensation Act. (Lab. Code, § 3600 et seq.; *Borello, supra,* 48 Cal.3d at pp. 351–356.)

██ Unlike common law principles, the policies behind the act are not concerned with "an employer's liability for injuries caused *by* his employee." (*Borello, supra*, 48 Cal.3d at p. 352.) Instead, they concern " 'which injuries *to* the employee should be insured against by the employer. [Citations.] . . . .' [Citations.]" (*Ibid.*) Accordingly, in the workers' compensation context, in addition to the "control" test, the question of employment status must be decided with deference to the "purposes of the protective legislation." (*Id.* at p. 353.) "The nature of the work, and the overall arrangement between the parties, must be examined to determine whether they come within the 'history and fundamental purposes' of the statute." (*Id.* at pp. 353–354.) These are: "(1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society[;] (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production[;] (3) to spur increased industrial safety[;] and (4) in return, to insulate the employer from tort liability for his employee's injuries. [Citations.] [¶] The Act intends comprehensive coverage of injuries in employment. It accomplishes this goal by defining 'employment' broadly in terms of 'service to an employer' and by including a general presumption that any person 'in service to another' is a covered 'employee.' [Citations.]" (*Id.* at p. 354.)

██ Second, the court affirmed that factors other than "control" must be considered since that test, "applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." (*Borello, supra*, 48 Cal.3d at p. 350.) The individual factors are not to " 'be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (*Borello, supra*, at pp. 350–351, fn. omitted.) The factors find support in prior case law (*Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43–44 [168 P.2d 686] overruled on another ground in *People v. Sims* (1982) 32 Cal.3d 468, 480 [186 Cal.Rptr. 77, 651 P.2d 321]; *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949 [88 Cal.Rptr. 175, 471 P.2d 975]); the Restatement Second of Agency; other legislation pertaining to the contractors state license law and providing "extensive guidelines for determining whether one who operates under a required contractor's license is an independent contractor or an employee" (*Borello, supra*, at p. 351, fn. 5, 350–355); and case law from other jurisdictions concerning the determination of "independent contractorship in light of the remedial purposes of . . . legislation." (*Id.* at p. 354, citing federal case law construing the Fair Labor Standards Act].)

The court declined to adopt "detailed new standards for examination of the issue," but stated that these factors "may often overlap those pertinent under

the common law," that "[e]ach service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case," and "all are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law."[14] (*Borello, supra,* 48 Cal.3d at pp. 354–355.)

In *Borello,* the court rejected the hirer's contentions about the absence of an employment relationship and concluded that the particular hirees there were employees and not independent contractors. This, despite that the employer did not exercise significant control over the details of the work, which was the growing and harvesting of cucumbers for the production of pickles. The minimal degree of control that the employer exercised over the details of the work was not considered dispositive because the work did not require a high degree of skill and it was an integral part of the employer's business. The employer was thus determined to be exercising all *necessary* control over the operation as a whole. (*Borello, supra,* 48 Cal.3d at pp. 355–360.)

Substantial evidence in the administrative record supports the same conclusion here. As found by the Department, the functions performed by the drivers, pickup and delivery of papers or packages and driving in between, did not require a high degree of skill. And the functions constituted the integral heart of JKH's courier service business. By obtaining the clients in need of the service and providing the workers to conduct it, JKH retained all *necessary* control over the operation as a whole. Under *Borello,* and similar

---

[14] These factors substantially include: (1) whether there is a right to fire at will without cause; (2) whether the one performing services is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the services are to be performed; (7) the method of payment, whether by the time or by the job; (8) whether or not the work is a part of the regular business of the principal; (9) whether or not the parties believe they are creating an employer-employee relationship; (10) whether the classification of independent contractor is bona fide and not a subterfuge to avoid employee status; (11) the hiree's degree of investment other than personal service in his or her own business and whether the hiree holds himself or herself out to be in business with an independent business license; (12) whether the hiree has employees; (13) the hiree's opportunity for profit or loss depending on his or her managerial skill; and (14) whether the service rendered is an integral part of the alleged employer's business. (*Borello, supra,* 48 Cal.3d at pp. 350–355.)

to its facts, these circumstances are enough to find an employment relationship for purposes of the Workers' Compensation Act, even in the absence of JKH exercising control over the details of the work and with JKH being more concerned with the results of the work rather than the means of its accomplishment. (See *Borello, supra,* 48 Cal.3d at pp. 355–360; see also *Yellow Cab Cooperative, Inc. v. Workers' Comp. Appeals Bd., supra,* 226 Cal.App.3d 1288, 1293–1300.) And neither JKH's nor the drivers' own perception of their relationship as one of independent contracting, or any other single factor, either alone or in combination, mandates a different result. We therefore reject JKH's contention that its lack of control over the details of the work, the drivers' use of their own cars, and the presence of the "Independent Contractor Profiles" signed by the drivers dictate but one conclusion here—that the drivers are independent contractors. This contention does not adequately take into account the comprehensive and authoritative holding of *Borello.*

We further reject JKH's contention that under *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425 [277 Cal.Rptr. 807] (*Millsap*), we must conclude that the administrative record here establishes only the absence of an employment relationship. First, and significantly, *Millsap* was deciding the question of whether an employment relationship existed for common law negligence purposes (the hirer's liability to a third party for the conduct of the hiree) and not for purposes of the Workers' Compensation Act. As *Borello* holds, we must decide this question with specific reference to this protective legislation, and with its history and purposes in mind. (*Borello, supra,* 48 Cal.3d at pp. 352–353.) Secondly, on the facts, the hiree in *Millsap,* who similarly made deliveries for the hirer, was paid on a per route, "piecemeal" basis whenever he submitted invoices and the court concluded that each time he picked up packages for delivery, there was a new "contract." (*Millsap, supra,* 227 Cal.App.3d at p. 432, fn. 3.) In contrast, here, the route drivers are paid on an hourly basis, all the drivers receive their pay on regularly scheduled paydays, and several of the drivers have maintained their working relationships with JKH on the same terms for at least a couple of years. In sum, because of its context and its sufficiently distinguishable facts, *Millsap* does not dictate a finding here that JKH's drivers are independent contractors.

Nor does the other case that JKH relies on, *State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188 [38 Cal.Rptr.2d 98] (*Brown*), compel that conclusion. There, the dispute concerned the collection of workers' compensation premiums alleged to be owed by a trucking company. Thus, like *Millsap, Brown* was not a case in which the court was making a determination about the hiring relationship against the backdrop of the Workers'

Compensation Act. Instead, the plaintiff, State Compensation Insurance Fund, raised contract claims solely for the collection of insurance premiums. Further, as a factual matter, the nature of the work in *Brown*—truck driving— was determined by the court to require skill, abilities, and the exercise of discretion beyond that expected or required of a general laborer. (*Brown,* at pp. 202–203.) Also, the truck drivers were found to be engaged in a distinct occupation from that of the hirer, who functioned essentially as a "broker" of trucking services. The truck drivers made substantial capital investment in their own trucks, and they were paid on a job by job basis. The totality of these circumstances led the court to conclude that there was no employment relationship and that the truck drivers were entrepreneurial and truly independent contractors. (*Id.* at p. 203.) The same cannot be said here based on the facts cited in the Department's decision. And those facts are supported by substantial evidence in the record.

Finally, JKH cries foul in response to the Department's argument that its classification of the drivers as independent contractors was based on subterfuge and that this artifice was a factor tending to show an employment relationship. But substantial evidence supports the Department's argument. The record is undisputed that JKH appears to have been formed in response to a prior stop work order issued to VIP Courier and that JKH operates its delivery services in the same structural fashion, despite its incorporation and the "Independent Contractor Profiles" having been signed by JKH's drivers. *Borello* specifically cites the bona fides of the independent contractor classification as a factor that is relevant to the determination of an employment relationship. (*Borello, supra,* 48 Cal.3d at p. 351, fn. 5.)

■ In sum, there is substantial evidence in light of the whole record to support the Department's determination that 15 of 16 of JKH's drivers were functioning as its employees rather than as true independent contractors. Even JKH concedes that there is some evidence in the record of certain factors tending to support this, though it describes this evidence as "minimal" and short of substantial. But where, as here, our review is limited to examining the whole administrative record to determine if the Department's findings and order are supported by substantial evidence, it is not our function to reweigh the evidence or the particular factors cited by the Department in support of its decision, to which we afford considerable deference. Once we conclude, as we have here, that the Department's findings are indeed supported by substantial evidence, and that those findings in turn support the Department's legal conclusion or ultimate determination, our analysis is at an end.

## DISPOSITION

The trial court's order denying JKH's petition for writ of mandate and granting the Department's request for a preliminary injunction is affirmed.

Elia, Acting P. J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 20, 2006, S147462.