Filed 3/27/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| ALAMEDA HEALTH SYSTEM et al.,<br><br>    Plaintiffs and Appellants,<br>v.<br><br>ALAMEDA COUNTY EMPLOYEES'<br>RETIREMENT ASSOCIATION et al.,<br><br>    Defendants and Respondents. | A165587<br><br>(San Francisco City & County<br>Super. Ct. No. CPF-19-516795) |

This appeal involves a dispute between employer Alameda Health System (AHS) and two of its employees, on the one hand, and the county retirement system known as Alameda County Employees' Retirement Association (ACERA)[1] on the other. AHS is one of seven public entities (participating employers) that participate in ACERA's multi-employer retirement system enabling their employees to become members of, and earn retirement pensions through, ACERA. The dispute concerns ACERA's method for determining the annual contributions participating employers must make toward unfunded liabilities to ensure the retirement system will be able to fund the pensions the employers have promised their employees.

---

[1] AHS and the two employees also sued ACERA's Board and its Chief Executive Officer. For convenience, we collectively refer to the entity and its Board and CEO collectively as "ACERA."

1

The method ACERA has used since its inception in 1948 to calculate annual contributions for unfunded liabilities among its participating employers is known as the "Percentage of Payroll" method. It is a common and well-accepted cost-sharing actuarial methodology for funding multi-employer defined benefits plans nationally and in California. The Percentage of Payroll method involves pooling of actuarial risk to reduce volatility in employer and employee contribution rates, reduce complexity in calculation of contributions and ensure sufficient funds are contributed to the retirement system on a timely basis.

AHS, which was established by Alameda County in 1998 and became a participating employer in ACERA in 1999,[2] first raised concerns about the Percentage of Payroll method of determining employer contributions in 2015. A study ACERA's actuary performed that year at AHS's request indicated AHS might have contributed considerably less to ACERA in 2014 had a different method, known as "Percentage of Liability," instead been used to determine employer contributions. Based on that study, AHS asserted it had "subsidized" the cost of participation by other plan members in the retirement system for over a decade "without measurable benefit." AHS requested that ACERA change its methodology to the Percentage of Liability method, which it claimed would result in it paying $12 million less in contributions each year going forward, and retrospectively reallocate to the other participating employers contributions it had previously made of "approximately $65 million (before any adjustments for investment earnings)."

---

[2] Initially, AHS was known as the Alameda County Medical Center, or ACMC. In 2013, it became AHS. For simplicity, we refer to it throughout as AHS.

After a meeting ACERA held with its participating employers, including AHS, to address AHS's request, the largest participating employer, the County of Alameda, objected to AHS's proposal and criticized the study ACERA's actuary had prepared. AHS then requested that ACERA provide further historical data regarding the unfunded liability that had been allocated to it in prior years. After meetings of ACERA's Actuarial Committee and further meetings of its Board of Retirement of the Alameda County Employees' Retirement Association (Board), the Board voted unanimously, based on its staff's recommendations, to deny AHS's requests to conduct a further actuarial study and to change its long-standing methodology for allocating unfunded liability to participating employers.

In 2019, AHS filed a petition for writ of mandate and complaint for declaratory relief challenging ACERA's decisions, seeking a writ under Code of Civil Procedure section 1085 (section 1085) commanding ACERA to set aside its decisions to deny AHS's request for a further actuarial study and demand for a change in the Percentage of Payroll methodology, to conduct the further study, and to determine the unfunded liability attributable to AHS under the alternative Percentage of Liability methodology AHS preferred.

In 2022, after three years of litigation, including multiple rounds of demurrers, amended petitions and discovery, the parties stipulated to a briefing schedule for summary judgment. In January 2022, ACERA filed a motion for summary judgment, after which AHS filed an opposition and ACERA a reply. The court heard the motion on May 2, 2022, and issued its order granting the motion on May 3, 2022, and judgment was entered in favor of ACERA on May 24, 2022. AHS timely appealed from the judgment.

AHS raises four arguments on appeal. First, it contends the trial court erred by applying the abuse of discretion standard to its mandamus cause of

3

action, contending *O'Neal v. Stanislaus County Employees' Retirement System Association* (2017) 8 Cal.App.5th 1184 adopted a less deferential standard for claims that allege breaches of fiduciary duty. Second, it contends there was evidence that the County's stated rationales for its decision were "pretextual" and raised triable issues of fact precluding summary judgment. Third, it contends that even if it should have pled the breach of fiduciary duty as a "stand-alone formal cause of action," the court erred in denying it leave to amend. Fourth, it contends the trial court erred in concluding there was no extant contract between AHS and ACERA that could serve as the basis for the claim that ACERA breached the covenant of good faith and fair dealing.

For reasons we shall explain, we affirm the judgment.

## BACKGROUND

ACERA is a " 'cost-sharing, multiple-employer defined benefit pension plan' " established by the Alameda County Board of Supervisors in 1948 under the County Employees Retirement Law of 1937, Government Code sections 31450 et seq. ("CERL"). ACERA members are current and former employees of seven participating employers: the County, the Superior Court of Alameda County, AHS, First 5 Alameda County, the Housing Authority of Alameda County, Livermore Area Recreation and Park District and the Alameda County Office of Education. ACERA has about 24,000 members, and the ACERA Board invests trust funds on their behalf with a net market value of $9.6 billion as of December 31, 2020. Since 2003, ACERA's consulting actuary has been Segal Consulting (Segal).

Appellant Alameda Health System (AHS) is an integrated public health system serving the medically indigent. Prior to July 1998, the County provided the health services AHS now provides. In that year, the County established an entity separate from the County that is now known as AHS

4

and transferred certain County hospitals and health and medical facilities to that new entity. The County and AHS entered a "Master Contract" and associated agreements to effect these changes.

AHS initially operated the hospitals and other facilities using County employees, for whom AHS assumed personnel costs. Subsequently, the County employees working in AHS hospitals and facilities became employees of AHS. AHS adopted a resolution providing that all eligible officers and employees of AHS would be included in ACERA effective in January 1999. AHS also expressed its desire to continue the retirement benefits of its employees who formerly worked for the County without interruption and authorized payment of contributions required because of the transition. In February 2000, ACERA consented to include AHS officers and employees as ACERA members and to AHS's request that former County employees' benefits would be included without interruption and AHS would pay the contributions required. AHS thus became a participating employer in ACERA.

Since its inception in 1948, ACERA has used the Percentage of Payroll methodology recommended by its consulting actuaries to calculate employer contribution rates for participating employers. ACERA has consistently applied this methodology to AHS and the County alike during the period since AHS became a participating employer. The Percentage of Payroll methodology pools actuarial risk to reduce volatility in both employer and active member contribution rates, reduce complexity in calculation of contributions and ensure sufficient funds are contributed to the retirement system on a timely basis. It is a common and well-accepted cost-sharing actuarial methodology for funding multi-employer defined benefit plans nationally and in California. From 1998 through 2015, AHS did not question

5

ACERA's application of the Percentage of Payroll methodology in allocating contributions among participating employers.

In July 2015, AHS asserted, based on a memorandum from its actuary, that it was paying higher contribution rates to ACERA because of the Board's "chosen allocation method," and that the costs had increased largely due to the "[g]rowth of AHS payroll relative to other employers in the system." AHS's actuary asserted that the "the increase in payroll without a corresponding shift in [ACERA's] allocation method means that AHS is shouldering an even higher share of non-AHS funded liabilities each year." AHS requested that ACERA examine "the manner in which the responsibility for ACERA unfunded liabilities has been allocated to AHS."

ACERA inquired whether its actuary, Segal, could provide the actuarial services AHS had requested, which would segregate liabilities by employers using the methodology AHS favored, and determine how that methodology might have affected the annual contribution amounts due from ACERA's participating employers 1998 until 2015. Segal responded it could do so but would rely on two simplifying assumptions, which were based on the proposition that AHS "was granted a 'fresh start' when it separated from the County in that it would have no liability for the retirement benefits that employees of County-run hospitals and clinics earned prior to the separation." However, in applying the Percentage of Payroll methodology to AHS prior to that, ACERA had "included 'retroactive' unfunded liabilities that were attributable to ACERA members who retired before 1999." The County and AHS dispute whether, under the Master Contract they executed in 1998, AHS agreed to assume the unfunded liabilities attributable to staff who worked for the County before the transfer (pre-separation liabilities).

6

The study, paid for by AHS, was done with the simplifying assumptions, and yielded a result that, based on those assumptions, applying the Percentage of Liability methodology AHS preferred instead of the Percentage of Payroll methodology ACERA had used might have resulted in AHS paying about $12 million less during 2014, with the other participating employers contributing the difference. AHS took that to mean ACERA had "overcharged" it and "undercharged" the other participating employers over the past 17 years and requested that ACERA change its actuarial funding policy for unfunded liability to the Percentage of Liability (AAL) methodology both prospectively and retrospectively, which would entail reallocating about $65 million (before adjustment for investment earnings) in past contributions from other participating employers to AHS.[3]

ACERA organized a meeting of its participating employers for December 2016 to consider AHS's request. At that meeting AHS presented its request, Segal made a presentation on funding policy considerations applicable to actuarial contribution rate setting, and the County expressed its objections to AHS's request. The County objected to AHS's claim that it was not responsible for pre-separation liabilities and to the related simplifying assumptions and data limitations in the 2015 Segal study. The County contended the growth in AHS's payroll was primarily due to its paying higher salaries and benefits to more employees and that AHS should contribute proportionately to the liabilities its own decisions generated.

Subsequently, AHS requested that ACERA provide "additional data to support our efforts to analyze the unfunded liability allocated to [AHS]." The

---

[3] The parties dispute whether a retrospective allocation would affect participating employers other than AHS and the County, but that dispute is immaterial. What is clear is that as the largest employer, by far the County would have shouldered the lion's share of the burden of any reallocation.

request sought work to be performed by ACERA's actuaries, and ACERA asked AHS to submit an outline of the data that would be needed to complete the second study. AHS requested a file containing all ACERA general retirees who retired during a 1.5-year period from July 1998 through December 1999 so it could determine which ones worked at AHS after its separation from the County; an analysis of headcount, total payroll, average payroll and average service divided by company code and by tier to enable it to assess whether its workforce "has had higher turnover than the general ACERA population, which would imply that many workers who may be receiving higher salaries (and a portion of unfunded liabilities) eventually terminate without a vested benefit and thus do not contribute as much to the overall liability"; and a review of "historical liability and valuation results using Fresh-Start Data/Liability."

In a follow up letter, AHS discussed its views regarding "legacy liability," which it defined as pension liability associated with the individuals who worked at the County Hospital and then retired prior to the separation of AHS from the County and individuals who worked at the County Hospital prior to separation but continued to work for AHS after separation. AHS said it did not interpret its Master Contract with the County to require it to assume any liabilities for accrued but unfunded pension benefits of those employees. It became apparent to ACERA that the County and AHS had a disagreement in the interpretation of their contract regarding pension liabilities for pre-separation terminated members who worked at the County hospitals and clinics.

ACERA staff brought AHS's request to the Actuarial Committee of its Board in June 2017. At this meeting, AHS presented its requests to the Committee.

8

At the same meeting, Segal made a presentation on the actuarial bases for its longstanding use of the Percentage of Payroll methodology. It explained that as a "cost-sharing, multiple-employer defined benefit pension plan," ACERA calculates contribution rates on a pooled basis, without considering membership specifics from particular employers and analogized to "a big insurance company" where "[e]very policyholder within the insurance company pays the same premium, more or less." Segal further stated that the "general policy goal of pooling is to have more stable, and also more fair and equitable, UAAL [unfunded liability] rates for all participating employers, given that typically short-term fluctuations in a particular participating employer's demographic experience *will even out over time*." It further stated that "pooling of the UAAL can provide a more stable contribution rate for smaller participating employers, as it smooths out fluctuations in factors such as disability retirement and mortality experience."

After discussion among the Actuarial Committee members, the committee directed ACERA staff to develop "decision points outlining necessary legal and operational questions to answer before the Committee decided whether to move forward with the actuarial study."

In September 2017, the Actuarial Committee met again to continue discussion of AHS's request. ACERA staff explained the decision criteria it had developed, which included whether there was "an appetite for changing the current methodology, regardless of the study outcome; whether the outstanding legal issue of pre-separation liability would prevent a clear picture of liability from being resolved even if a study were conducted; and whether the complexity, length, and impact of performing the study" was something the Board wished to undertake at that time. ACERA staff

9

recommended that the Board not proceed with the study, given that the outstanding issue of the pre-separation liability was unresolved and that changing the methodology was a significant change in plan funding design.

The committee, after presentations and discussion, tabled the motion, asking that AHS and the County discuss the pre-separation and data issues and attempt to come to agreement before bringing the issue back to the Board. In October 2017, representatives of AHS, the County and ACERA met to attempt to reach agreement on the disputed pre-separation liabilities and various other assumptions and data questions related to a further study. They were unable to reach an agreement.

In December 2017, AHS renewed its demand to the ACERA Board that it revise its methodology for determining employer contribution rates, and the following month, the County reiterated its objections to the second study and to a change in funding methodology.

ACERA's CEO, David Nelsen, in consultation with Segal, sent the Board a memorandum setting forth the staff's recommendations. The memo recommended that the Board deny AHS's request for a further study "given the challenges of the data and the unresolved underlying issue of pre-separation liability." Among other things, the memo stated, "AHS has sought to have ACERA resolve the differences between AHS and the County by conducting a comprehensive study to determine which employees and retirees are the responsibility of each, and to create a new methodology for recovering the unfunded liability that only charges AHS for its 'actual liability' rather than a pooled amount based on a percentage of payroll." The memo further stated, "For reasons more fully explained in the attached materials, conducting the study requested by AHS presents significant policy and

logistical challenges.[4]  From an administrative point of view, the fundamental question of how to allocate employees to each employer must be resolved before the data, even if it can be obtained, will have any significance. The ultimate policy decision is whether the Board wishes to change its longstanding methodology regardless of the outcome of any study. [¶] Staff continues to believe that the comprehensive study requested by AHS will not provide dispositive information without resolution of the dispute between the County and AHS about responsibility for the employees in question.  Going through the significant administrative challenges of gathering this information is daunting given its ultimate limited utility without that resolution. [¶] Staff further believes that the Board is within its discretion to set the methodology for assessing employer contributions, and that continuing to use a percent of payroll is fiscally prudent for the plan and its members and is reasonable and fair to the employers as a whole."  The memo further recommended that the Board "deny AHS's request for a change to the existing cost-allocation methodology under the pooling arrangement as, in the opinion of the Board, the current arrangement is actuarially sound and fiscally prudent for the plan and fair to the employers as a whole."

---

[4] The memo described the logistical challenges.  These included limitations in information due to a change in software, which meant there was "no easy or efficient way to account for employees working or retiring from 7-1-98 to 2003 when AHS employees began being reported separately from the County"; a lack of "data to identify members who retired from the County hospitals prior to 7-1-98"; uncertainty as to how the actuary should "treat ACMS/AHS inactives or retirees who have not worked on or after 7-1-98," whether they should be treated as County or AHS employees, and "who makes that decision."  Regarding AHS's request for a review of historical liability and valuation results using the "fresh-start data/liability," Segal would not have access to the information between 7-1-98 and 12-31-03 as they were not ACERA's actuary at that time.

11

The ACERA Board addressed AHS's requests at a meeting in January 2018.  At the conclusion of the meeting, after presentations by ACERA's CEO, AHS's General Counsel and ACERA's actuary (Segal), the Board voted unanimously, 8 to 0, to deny AHS's requests for further study and for a change in the methodology for determining participating employers' contributions to unfunded liabilities.

In February 2019, AHS filed the petition and verified complaint (Petition) against the County, ACERA and ACERA's Board and CEO in Alameda Superior Court; in March 2019, it filed a first amended petition; and in April 2019, the court granted AHS's motion for change of venue.

In September 2019, ACERA filed a demurrer and a motion to strike portions of the first amended petition, and in February 2020, the San Francisco Superior Court sustained the demurrer in part and overruled it in part, with leave to amend, and denied the motion to strike.  The court overruled the demurrer as to the petition for writ of mandate and the claim for declaratory relief on the ground that, "[f]or purposes of ruling on demurrer, the allegations are sufficient to support abuse of discretion."

In July 2020, AHS filed a second amended petition, to which the County demurred, and in February 2021, the court overruled the demurrer.

In April 2021, AHS filed the operative third amended petition (Third Amended Petition).  In May 2021, the County and ACERA answered.  In January 2022, ACERA filed its motion for summary judgment or, in the alternative, summary adjudication, and the County filed notice that it and AHS had settled all AHS's causes of action against the County.

In May 2022, the trial court issued a thorough 24-page opinion granting ACERA's motion.  It concluded, as to the mandate and declaratory causes of action, first, that ACERA had no mandatory duty either to adopt a

particular actuarial methodology or to conduct a further a particular actuarial study as AHS had demanded; and second, that AHS had not shown that ACERA's decisions were arbitrary and capricious or completely lacking in evidentiary support, or that the Board failed to follow proper procedures. As to the cause of action for breach of the covenant of good faith and fair dealing, the court held that the undisputed facts did not establish an enforceable contract between AHS and ACERA, and, in the alternative, even if there had been a contract, AHS's claim sought to vary its terms.

Thereafter, judgment was entered and AHS timely appealed. For the reasons set forth below, we affirm.

## DISCUSSION

### I.

### *AHS Has Failed to Show the Trial Court Erred in Granting Summary Judgment to ACERA on AHS's Petition for Writ of Mandate and Declaratory Relief Cause of Action.*

#### A. Legal Standards Governing Summary Judgment

Summary judgment is governed by well-established standards. " 'Summary judgment is properly granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant seeking summary judgment bears the initial burden of proving the "cause of action has no merit" by showing that one or more elements of plaintiff's cause of action cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subds. (a), (o)(2); [citations].) Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action.' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.)

The pleadings establish "the outer measure of materiality in summary judgment proceedings." (*FPI Development, Inc. v. Nakashima* (1991)

13

231 Cal.App.3d 367, 381.) " 'The purpose of a summary judgment proceeding is to permit a party to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.' [Citation.] 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings.' [Citations.] The complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action." (*Ibid.*) "Accordingly, the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.) "We do not require [defendants] to negate elements of causes of action plaintiffs never pleaded." (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 182.)

On review of an order granting summary judgment, " '[w]e review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) Summary judgment is no longer a disfavored procedure, but "is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.)

**B.** **The Trial Court Did Not Err in Applying Traditional Mandate Standards to AHS's Petition for Writ of Mandate and Claim for Declaratory Relief.**

**1.** ***AHS and Its Two Employees Filed and Pursued a Petition for Writ of Mandate, not a Common Law Claim for Breach of Fiduciary Duty.***

AHS and the two employees who joined it in this litigation at all times pursued a petition for writ of mandate and not a common law cause of action for breach of fiduciary duty. This is significant because, as we shall discuss, the standards governing a writ of mandate under section 1085 are deferential to a public agency's quasi-legislative actions.

In February 2019, AHS filed its initial Petition. The Petition asserted three claims against ACERA: the first, petitioning for a writ of mandate under section 1085; the second, seeking declaratory relief based on the same allegations as the writ petition; and the fifth for breach of the covenant of good faith and fair dealing. Despite amending its petition three times, twice after demurrers, the basic claims remained the same. Thus, the operative Third Amended Petition, filed in April 2021, contained the same three causes of action against ACERA, for writ of mandate under section 1085, declaratory relief and breach of the covenant of good faith and fair dealing.

None of AHS's pleadings included a cause of action, either on its own behalf or on behalf of the two employees, for breach of fiduciary duty by ACERA. The gist of AHS's Third Amended Petition, like the earlier versions, was that ACERA had been "systematically overcharging AHS for its fair and equitable share of unfunded pension liabilities attributable to AHS's employees and retirees," had been doing so "for years, . . . thereby causing AHS to unfairly subsidize the unfunded pension liabilities of other employers who are members of ACERA," had "steadfastly refuse[d] to do anything,

15

claiming that it has unfettered and plenary discretion to set the Participating Employer contribution rates, despite the fact that the methodology is inequitable and outright capricious," and that ACERA was "acting at the behest of Alameda County . . . , the largest plan sponsor and who dominates ACERA's Board of Directors" and had "acquiesced to the County's interests to ensure the County is subsidized by AHS, and the County's costs are artificially lowered." AHS further claimed that "[t]he reasons given for ACERA's denial [of AHS's request that it change its methodology] are pretextual or are without statutory authority" and that ACERA's "true reason was . . . to reduce the costs for the County by having AHS subsidize the unfunded liabilities for the County and other Participating Employers."

AHS sought a writ of mandate "requiring ACERA and its Board to properly exercise their discretion, without pretext or resort to considerations that are improper or without legal basis, in considering AHS's demand that ACERA adopt a fair and equitable method for determining the responsibility of Participating Employers for unfunded pension liabilities attributable to their workforce" and directing it "to conduct further study to determine which employees and retirees are attributable to AHS and which are attributable to the County ( . . . for which AHS agreed to pay)" and "to determine the amount of AHS's actual unfunded pension liability for these employees."

There was no ambiguity about the nature of the writ of mandate claim in the Petition. This is so notwithstanding that its allegations accused ACERA of breaching various alleged "duties." The claim was entitled "Writ of Mandate, Code of Civil Procedure Section 1085, Brought by AHS, and [the two employees] Against ACERA and the ACERA Board." It included the allegations generally required for writ relief under section 1085, including that AHS and the two employees "are beneficially interested in ACERA and

16

its Board's proper exercise of their duties and responsibilities" and "have no plain or adequate remedy at law" (see Code Civ. Proc. § 1086 [beneficial interest and no adequate alternative remedy requirements]; *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165 ["As a general rule, a party must be 'beneficially interested' to seek a writ of mandate" and "[t]he beneficial interest must be direct and substantial"]; *Agosto v. Bd. of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 336 [" 'It is a general rule that the extraordinary remedy of mandate is not available when other remedies at law are adequate' "]) and "the issuance of a writ of mandamus will be an effective remedy." The beneficial interest was described as a "budget deficit" faced by AHS, allegedly "caused in part by ACERA's continued overcharging of AHS," that "creates a genuine threat of workforce and/or compensation reductions." It alleged "the public interest [would] suffer from ACERA's actions because AHS's mission to provide health care to the indigent population of Alameda County is compromised by ACERA's continuing overcharging of AHS." And it alleged ACERA's actions were "arbitrary and capricious and in violation of its constitutional and statutory duties."

Neither the writ cause of action nor the cause of action for declaratory relief, which is based on the same allegations, can reasonably be construed as a common law cause of action for breach of fiduciary duty. Nor can the cause of action for breach of the covenant of good faith, which is based on allegations that ACERA breached the covenant of good faith in an alleged contract between it and AHS, by denying AHS's requests that it change its methodology for assessing unfunded liabilities and conduct a study to show what AHS's contributions would have been under an alternative methodology AHS claims should have been used.

17

## 2. *The Standards Governing Petitions for Writ of Mandate Are Well Established.*

The writ of mandate, codified in Code of Civil Procedure section 1085, "is the traditional remedy for the failure of a public official to perform a legal duty." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.) Mandamus will lie "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) Writ relief is available in two circumstances.

First, "[a] court may issue a writ of mandate to compel a public agency or officer to perform a mandatory duty. [Citation.] 'This type of writ petition "seeks to enforce a mandatory and ministerial duty to act on the part of an administrative agency or its officers." ' " (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 914.) To obtain relief on this basis, the petitioner must establish the existence of a public officer's or a public entity's "clear, present, and ministerial duty where the petitioner has a beneficial right to performance of that duty." (*California Assn. of Professional Scientists v. Department of Finance* (2011) 195 Cal.App.4th 1228, 1236; see *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653.) Under this theory, "[m]andamus may issue . . . to compel an official both to exercise his discretion (if he is required to do so) and to exercise it under a proper interpretation of the applicable law." (*Common Cause v. Board of Supervisors*, *supra,* 49 Cal.3d at p. 442.) However, " ' "[t]he writ will not lie to control discretion conferred upon a public officer or agency." ' " (*Collins,* at p. 914.)

"Second, a court may issue a writ when a public agency has abused its discretion in carrying out a *discretionary* function. 'Although traditional mandamus will not lie to compel the exercise of discretion in a particular

18

manner, it is a proper remedy to challenge agency discretionary action as an abuse of discretion.' " (*CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 279.)  " 'When a court reviews a public entit[y's] decision for an abuse of discretion, the court may not substitute its judgment for that of the public entity, and if reasonable minds may disagree as to the wisdom of the public entity's discretionary determination, that decision must be upheld. [Citation.]  Thus, the judicial inquiry . . . addresses whether the public entity's action was arbitrary, capricious or entirely without evidentiary support, and whether it failed to conform to procedures required by law.' " (*Id.* at p. 280.)

" '[N]onadjudicatory acts "are accorded the most deferential level of judicial scrutiny." ' " (*Weinstein v. County of Los Angeles* (2015) 237 Cal.App.4th 944, 964.)  " ' "Such review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support." ' " (*Ibid.*)  "In determining whether evidentiary support is present in a traditional mandamus action, the applicable standard of review is the substantial evidence test.  [Citations.]  The court may not reweigh the evidence and must view the evidence in the light most favorable to the District's actions and indulge all reasonable inferences in support thereof." (*Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1988) 195 Cal.App.3d 1331, 1340.)  "Substantial evidence has been defined as relevant evidence that a reasonable mind might accept as adequate support for a conclusion.  [Citation.]  A presumption exists that an administrative action was supported by substantial evidence.  [Citation.]  The burden is on the appellant to show there is no possible substantial evidence whatsoever to support the findings of the District." (*Id.* at pp. 1340-1341.)  Finally, "[i]n an ordinary mandamus review of a legislative or quasi-legislative decision,

courts decline to inquire into thought processes or motives, but evaluate the decision on its face because legislative discretion is not subject to judicial control and supervision." (*San Joaquin Local Agency Formation Commission v. Superior Court* (2008) 162 Cal.App.4th 159, 171 (*SJ LAFCO*).)

This deferential standard is applied to the quasi-legislative decisions reviewed under section 1085 out of recognition of the "high degree of expertise" often developed by "agencies to which the Legislature has delegated regulatory authority in particular areas." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 (*Western States*).) "The courts exercise limited review of legislative acts by administrative bodies out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." (*California Hotel & Motel Assn. v. Indus. Welfare Com.* (1979) 25 Cal.3d 200, 211-212.)

On appellate review of a mandate ruling, "the trial court's findings as to foundational facts are conclusive if supported by substantial evidence. [Citation.] Thereafter we perform essentially the same function as the court below, determining if the local entity's action was arbitrary or palpably unreasonable." (*County of Del Norte v. City of Crescent City* (199) 71 Cal.App.4th 965, 973.) Where, as here, the trial court made no factual findings and the relevant facts are undisputed, we apply a de novo standard of review. (*CV Amalgamated LLC v. City of Chula Vista, supra,* 82 Cal.App.5th at p. 280.)

### 3. O'Neal[5] *Did Not Alter the Standards Governing Petitions for Writ of Mandate Challenging Retirement System Actuarial Decisions.*

AHS's primary argument is that the trial court erred in applying "boilerplate standards" governing writs of mandate under section 1085 because the "substance of its allegations" is that ACERA breached its "fiduciary duties of loyalty and prudence" to AHS employees. For this argument, AHS relies on *O'Neal, supra,* 8 Cal.App.5th 1184.

*O'Neal* does not support AHS's argument. Rather, in that case, three members of the Stanislaus County Employees Retirement Association (StanCERA) sued it, asserting five claims for breach of fiduciary duty alleging that certain acts it took to reduce the County's annual contributions for unfunded liabilities in the wake of the 2008 global downturn caused the retirement system to lose assets and investment earnings and reduced its funding ratios. (*O'Neal, supra,* 8 Cal.App.5th at pp. 1194-1197.) *O'Neal* did not address or apply writ of mandate standards. The plaintiffs in that case had not filed a petition for writ of mandate but had instead filed common law claims for breach of fiduciary duty. Since *O'Neal* did not address writ of mandate standards at all, it does not support AHS's argument that it "rejected" the application of such standards to any claim alleging a retirement system has breached fiduciary duties. It is well established that a case is not authori1ty for a proposition it did not consider. (*Mercury Ins. Group v. Superior Court* (1998) 19 Cal.4th 332, 348 ["A decision, of course, is not authority for what it does not consider"]; *Mattson Technology, Inc. v. Applied Materials* (2023) 96 Cal.App.5th 1149, 1162.)

---

[5] *O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184 (*O'Neal*).

AHS also cites *Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140 (*Bandt*), asserting that the fact that a trial was held in that case, which like this one sought a writ of mandate based on a retirement board's actions, somehow supports their argument that applying writ of mandate standard principles rather than common law fiduciary duty principles "elevates form over substance." It does not. Superior courts regularly hold bench trials in cases in which mandamus is sought. That a trial is held on a writ of mandate petition does not mean section 1085 standards governing such petitions were not applied. Indeed, the appellate decision in *Bandt* indicates the trial court *did* apply writ of mandate standards. On appeal the appellants argued, as AHS does here, that the trial court should not have applied the abuse of discretion standard, while the retirement board and county argued it was right to do so. (See *Bandt*, at p. 149.) The appellate court did not address or resolve that issue because it concluded the appellants' challenge failed under any standard. (*Ibid.*)

Finally, AHS cites cases it claims require that a pleading be " 'judged by the substance of its allegations rather than its label.' " Those cases involved challenges to the pleadings, not motions for summary judgment,[6] and do not contradict the well-established rule that at summary judgment the moving party is entitled to rely on the pleadings to delineate the theories to which such a motion must be directed. (See *Hutton v. Fidelity National Title Co., supra,* 213 Cal.App.4th at p. 493; *Melican v. Regents of University of California, supra,* 151 Cal.App.4th at p. 182.)

---

[6] For example, *Jaffe v. Carroll* (1973) 35 Cal.App.3d 53, 56-57 was an appeal from a ruling sustaining a demurrer.

22

## C. AHS Failed to Raise a Triable Issue Precluding Summary Judgment on its Petition for Writ of Mandate Under Section 1085 or Its Parallel Claim for Declaratory Relief.

### 1. *AHS Does Not Contend ACERA Had or Breached Any Ministerial Duties.*

AHS sought a writ of mandate commanding ACERA to do two things: (1) "set aside [its] decision" denying "AHS's demand that [it] conduct a further actuarial study and change [its] methodology for assigning responsibility for pension system unfunded liabilities from Percentage of Payroll to Percentage of Liability, and reconsider AHS's demand based on factors that are legally valid and not pretextual"; and (2) "conduct a further study to determine which employees and retirees are attributable to AHS and which are attributable to the County, in order to determine the actual liability attributable to AHS under the Percentage of Liability method."

Neither the California Constitution nor CERL imposes a mandatory duty on ACERA to adopt a particular actuarial methodology to determine employer contributions or to perform a particular actuarial analysis. Management of the pension systems are solely within the province of the retirement system Board. (Cal. Const., art. XVI, § 17 (e) [retirement board "shall have the sole and exclusive power to provide actuarial services in order to assure the competency of the assets of the public pension or retirement system"]; Gov. Code, §§ 31520 [management of retirement system "vested in the board of retirement"], 31454.7 [retirement boards have "plenary authority to recommend adjustments . . . to ensure the appropriate funding of the system"].)

Moreover, AHS disclaims any argument that ACERA had a duty to adopt a particular actuarial methodology or conduct a particular actuarial study, asserting it sought only that ACERA be required to make "a decision

23

unclouded by County influence."[7]  According to AHS, it seeks to have

ACERA's Board " 'properly exercise its discretion without pretext or

considerations that are improper or without legal basis.' " Accordingly, we

turn to whether AHS raised a triable issue on its theories that ACERA

abused its discretion in carrying out its discretionary functions.

### 2.	*AHS Failed to Create a Triable Issue That ACERA Abused Its Discretion.*

AHS claims ACERA abused its discretion in two ways:  (1) its Board is

"dominated" and "influenc[ed]" by the County; and (2) its reasons for

declining to change its methodology and to conduct a further actuarial study

were "pretextual."  Neither contention has merit.

As to the first, CERL mandates that four of the Board's voting

members must be voters of the county appointed by the County Board of

Supervisors (one of which may be a supervisor) and that another member

must be the county treasurer.  (Gov. Code, §§ 31520.1, subd. (a), 31520.13.)

The other four must be members of the retirement system elected by other

members.  (See *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1095-1096

["Legislature *intended* for retirement board trustees to share interests with

their memberships"].)  Because the composition of ACERA's Board comports

with the statutory mandate, AHS cannot establish a triable issue as to

whether, by having a Board "dominated" by the County, ACERA abused its

discretion.[8]  As our high court observed in *Lexin*, the Legislature chose "the

---

[7]  We accept these concessions despite AHS's prayer in the Third Amended Petition for a writ commanding ACERA to conduct a particular study and to use a different methodology to determine AHS's "actual unfunded pension liability."  (See p. 16, *ante*.)

[8]  ACERA's Board at the relevant time included the County Treasurer; four county residents, one of whom was a county supervisor, all appointed by the County Board of Supervisors; and four ACERA members, including two

24

interested model of decisionmaking" for retirement systems in which "a blend of individuals, each with a clear stake in many decisions" will, "through the representation of all stakeholders," produce "fair and wise decisions." (*Id*. at p. 1096.) The Legislature could have required representation on the board of all participating employers in a multi-employer system, but it did not.

Turning to AHS's claim of pretext, we conclude it lacks merit because substantial evidence supports ACERA's decisions and AHS has not shown a triable issue that would defeat summary judgment. The undisputed evidence presented by ACERA in support of summary judgment demonstrated that ACERA engaged in an extended process to consider AHS's requests. Over a year and a half, its staff conferred with AHS about the requests on multiple occasions and arranged meetings of participating employers, and its Board and Actuarial Committee each held multiple public meetings to consider AHS's requests. The evidence also showed that ACERA had been using the same percentage of payroll methodology consistently for nearly six decades, and that the methodology pools pension obligations, assets and actuarial risk "so as to reduce volatility in both employer and active member contribution rates," "reduce complexity in the calculation of contributions" and "ensure that sufficient funds are contributed to the retirement system on a timely basis." Further, it showed that most other county retirement systems used the same methodology, and that it was a "common and well-accepted 'cost-sharing' actuarial methodology for funding multi-employer defined benefits plans" in California and nationally.

active general members elected by the active general members of ACERA, one active safety member elected by the active safety members of ACERA, and one retired member elected by the retired members of ACERA.

Undisputed evidence also showed that the Percentage of Liability method AHS proposed, by contrast, would "result[] in 'de-pooling' of a plan, thereby setting non-uniform assumptions as to, and tracking the specific experience of . . . each participating employer on a person-by-person basis" and "segregat[ing] assets and liabilities of each employer without 'cost-sharing.' " (Italics omitted.) Segal advised at one of the Board meetings that "[w]ithout pooling, there is the potential for contribution rate fluctuations from, among other factors," retirement experience, especially the number of disability retirements, mortality experience, termination experience and salary experience. Segal further explained that AHS had seen an increase in ACERA members from 2009 to 2015, but that "the primary reason for the higher payroll appears to be that AHS is paying its employees higher salaries than the County pays, which would justify higher retirement contribution costs, . . . given that pension amounts are calculated based in part on pensionable salary amounts." Segal stated that "[t]he 'key' to the AHS proposal was that '[l]iabilities for service earned by [AHS] members prior to separation of AHS as a County Department on 7/1/98 should be allocated to the County,' and the County did not agree that those who provided services to hospitals and clinics before 7/1/98 (and terminated or retired) would not be counted for purpose of determining AHS liabilities because it asserted that AHS assumed those liabilities as part of its separation from the County."[9]

_____

[9] AHS had written to the ACERA Actuarial Committee in May 2017, describing its proposal: "AHS proposes that the Current Method be changed and replaced with another methodology, one that more closely reflects the fact that the participating employers have accumulated plan liabilities (particularly unfunded liabilities) over time in a manner that is not fairly represented by the current relative payroll (Proposed Method)." AHS discussed at length its views about why the County was, and AHS was not, responsible for the pre-separation liabilities. (See, e.g., p. 8, *ante.*)

Finally, undisputed evidence established there were concerns that the additional study AHS requested posed significant challenges and would not in any event resolve its dispute with the County over pre-separation liability or, therefore, what the effect of applying a different methodology on participating employers and ACERA members would be.[10]

In short, the record contains substantial evidence that ACERA carefully considered AHS's requests and made decisions supported by recommendations of its actuary and its staff based on legitimate reasons. As the trial court stated, "The minutes of the Board's January 18, 2018 meeting, Chief Executive Officer Nelsen's detailed memorandum to the Board in connection with that meeting, the extensive record of the parties' meetings and correspondence, and Actuary Yeung's exhaustive discussion of the factual background to the issues and the rationale for the actuarial decisions made by ACERA on his recommendation, all demonstrate serious consideration by the Board of Petitioner's requests." Ordinarily that would suffice to end the mandamus inquiry.

AHS seeks to avoid the limited scope of review in mandamus proceedings and to create a triable issue of fact by arguing that ACERA's reasons for denying its requests were "pretexual," attacking what it describes as "ACERA's stated rationale" for denying further study. First, it argues ACERA's stated concerns about the dispute between the County and AHS as to which was responsible for pre-separation liabilities are pretextual. It claims the statement of "[ACERA's] CEO . . . that 'we can actually show it

---

[10] There was concern that AHS's premise that participating employers' "accumulated plan liabilities" were not fairly represented by the current (Percentage of Payroll) methodology necessarily depended, at least to some degree, on its contention that the disputed pre-separation liabilities should be attributed to the County and not to AHS.

27

both ways' (one with the County assuming all pre-Transfer liability and another with AHS assuming the liability)" demonstrates the concern about the pre-separation liability was a pretense. Next, AHS criticizes the ACERA CEO's suggestion in his memo to the Board before the January 2018 meeting that the Board first determine "whether or not there is sufficient willingness of the Board to consider changing the methodology" before embarking on the study. It goes on to criticize this rationale as "completely circular and put[ting] the cart before the horse" and "an invitation for arbitrary and capricious decision-making" reflecting "naked deference to the County's interests."

AHS's complaints about ACERA's so-called "pretextual" reasons for declining to change its methodology and to conduct a further actuarial study do not create a triable issue. As the trial court stated, "Petitioner's attacks on ACERA's motives in declining to comply with their demands to change the valuation methodology and to conduct a further actuarial study, and on the supposedly 'pretextual' reasons given by ACERA for declining to do so, are foreclosed by long-established restrictions on the scope of judicial review in traditional mandamus actions." The trial court relied on the rule that in reviewing quasi-legislative decisions, courts " 'evaluate the decision on its face' " without " 'inquir[ing] into thought processes or motives.' " (Citing *SJ LAFCO, supra,* 162 Cal.App.4th at p. 171 and *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1305.) As stated in *Mike Moore's Towing*, "In general, due to separation of powers considerations, '[t]he judiciary confines evaluation of a statute to the terms of the legislation itself and will eschew inquiry into what motivated or influenced those who voted on the legislation.' . . . The approach in these cases, declining to inquire into legislative thought processes or motives, is consistent with the limited

28

scope of review in ordinary mandamus proceedings of legislative decisions. In general, the court does not weigh the evidence adduced before the agency or substitute its judgment for that of the agency. [Citation.] The court will not concern itself with the wisdom underlying the agency's action." (*Mike Moore's Towing,* at pp. 1305-1306.)

The trial court concluded that the administrative record showed ACERA " 'adequately considered all relevant factors, and . . . demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' " Applying the ordinary mandamus rules, it rejected AHS's "contention that ACERA abused its discretion because the members of its Board purportedly sought to advance the County's interests ahead of AHS's, or were acting out of improper 'motives,' " as "groundless."

The trial court's conclusion is legally sound and factually supported by the undisputed evidence, which we have already discussed, and AHS's pretext arguments are beyond the scope of mandate review and therefore fail to raise a triable issue that ACERA abused its discretion.

### 3. The Trial Court Did Not Err in Excluding Evidence Outside the Administrative Record.

AHS offers another set of pretext arguments based on what it describes as "back-channel communications from the County to the ACERA officers and board," which it asserts support an inference that ACERA's decisions " 'were not taken in the exclusive interest of its members' " and that ACERA instead acted out of " 'other motives, impermissible under the California Constitution and trust law.' " AHS suggests these communications show ACERA's staff and Board members acted to further the County's interests at the expense of AHS and its employees who were members of ACERA and that the process in which ACERA engaged to consider AHS's requests was "tainted" by "impermissible considerations." It contends that the trial court erred both in

29

rejecting the pretext arguments and in holding the emails were inadmissible because they were an attack on ACERA's motives, which is impermissible in ordinary mandate proceedings, and because their admission is also barred by the rule that extra-record evidence will not be considered in such proceedings. AHS has again failed to show error.

The trial court correctly stated the rule that, " '[i]n an ordinary mandamus review of a legislative or quasi-legislative decision, courts decline to inquire into thought processes or motives, but evaluate the decision on its face because legislative discretion is not subject to judicial control and supervision.' " (Quoting *SJ LAFCO, supra*, 162 Cal.App.4th at p. 171.) It was also correct to apply the " 'unbroken line of cases hold[ing] that, in traditional mandamus actions challenging quasi-legislative administrative decisions, evidence outside the administrative record (extra-record evidence) is not admissible.' "

In *Western States, supra*, 9 Cal.4th 559, the court affirmed this rule, stating, "It is well settled that extra-record evidence is generally not admissible in non-CEQA traditional mandamus actions challenging quasi-legislative administrative decisions." (*Id.* at p. 574.) "This rule is consistent with substantial evidence review generally, and ensures that courts appropriately defer to the agency's expertise and its role as part of the separate and coequal executive branch." (*Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1103.) In *Western States*, our high court also observed that "extra-record evidence can never be admitted merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision." (*Western States*, at p. 579.)

30

As the *SJ LAFCO* court explained, "Limiting review to the administrative record is appropriate due to the scope of review. An action or proceeding to attack a determination of SJ LAFCO extends 'only to whether there was fraud or a prejudicial abuse of discretion. Prejudicial abuse of discretion is established if the court finds the determination or decision not supported by substantial evidence in light of the whole record.' (Gov. Code, § 56107, subd. (c).) This substantial evidence review is purely a question of law and is limited to the administrative record. [Citation.] [¶] Permitting the admission of extra-record evidence would also infringe upon the separation of powers. The Legislature has delegated quasi-legislative authority to SJ LAFCO under the Cortese–Knox–Hertzberg Local Government Reorganization Act of 2000. (Gov. Code, §§ 56000 et seq.) Excessive judicial interference with SJ LAFCO's 'quasi-legislative actions would conflict with the well-settled principle that the legislative branch is entitled to deference from the courts because of the constitutional separation of powers.' " (*SJ LAFCO*, *supra*, 162 Cal.App.4th at p. 167.) *SJ LAFCO* held the discovery sought "transgress[ed] the confines of *Western States*"; it "permit[ted] discovery of matters that are not admissible in a challenge to a quasi-legislative decision." (*Id.* at p. 172.)

AHS attempts to distinguish *SJ LAFCO* because the question it addressed was whether discovery the district sought should have been granted and AHS is not seeking discovery here, having apparently obtained it after the agency made its decision. It contends, the emails it obtained are "pre-decisional written communications to ACERA staff and board members from the County regarding AHS's requests" and "consist[] of public records," not depositions inquiring into a Board member's thought processes.

31

AHS misses the point for which *SJ LAFCO* is relevant, specifically, its *reasoning* for denying discovery. Inquiry into mental processes can be problematic in itself; indeed, in *SJ LAFCO*, one problem with the depositions themselves was that they would have violated the deliberative process privilege. (See *SJ LAFCO*, *supra*, 162 Cal.App.4th at pp. 170-171.) But the court denied the discovery for two additional reasons: the resulting evidence would have been inadmissible, both because consideration of motives exceeds the bounds of mandamus review of quasi-legislative decisions and because the evidence fell within no exception for extra-record evidence. (*Id.* at pp. 169-172.) In the case before us, AHS offered the emails to show ACERA's staff and Board members were "working to assuage the County's strenuous opposition to AHS's request for a study" and that " 'the decisions made by the [ACERA] board were not taken in the exclusive interest of its members.' " *SJ LAFCO*'s holding that the thought processes of LAFCO commissioners were beyond the scope of mandamus review and the evidence they sought to obtain was therefore inadmissible applies equally to the email evidence here.

AHS also contends that exceptions to the rule barring extra-record evidence recognized in *Western States* apply. But even if the email evidence fell within an exception, the rule barring inquiry into the motives of quasi-legislators would make the evidence irrelevant. Further, although the high court in *Western States* recognized there could be exceptions to extra-record evidence rule "under unusual circumstances or for very limited purposes" not before the court in that case (*Western States*, 9 Cal.4th at pp. 578-579), AHS fails to demonstrate an exception applies here.

It invokes an exception for evidence that existed before the agency made its decision where the proponent could not with reasonable diligence have presented the evidence to the agency before the decision was made. It

32

argues that because ACERA did not include the emails in the record, it was unable to obtain them until some undisclosed subsequent point after it made Public Records Act requests to ACERA and the County. But neither in the trial court nor here has AHS explained why, during the year and a half its request was pending, it could not have used the Public Records Act to obtain emails between ACERA and the County about its requests. It should have been obvious from the outset that the County would object to the requests, and it quickly became apparent that the County in fact objected.

AHS also argues that *Western States* recognized a potential exception for procedural unfairness and agency misconduct, which it contends these communications reflect. What procedural unfairness it means to assert is not clear. Insofar as it asserts the emails support an inference that ACERA's staff and Board members were working to assuage the County's strenuous opposition to AHS's request for a study, the argument is unpersuasive both on its merits and because it exceeds the bounds of writ of mandate review. It entails precisely the kind of assessment of quasi-legislative actors' motives that is barred by cases like *SJ LAFCO*.

In that case, the Irrigation District petitioner contended that SJ LAFCO applied "secret standards" and that its commissioners were influenced by "bias" in denying the district's application for approval to provide retail electric service. (*SJ LAFCO, supra*, 162 Cal.App.4th at pp. 163, 169.) The court issued a writ of mandate prohibiting the depositions of two of the SJ LAFCO commissioners that the trial court had allowed, because it concluded such evidence was inadmissible. One reason it was inadmissible was because any evidence such discovery would yield would be extra-record evidence, the admission of which was inconsistent with the scope of review in a challenge to a quasi-legislative action and would infringe on

33

separation of powers.  (See *id*. at pp. 167, 172.)  The evidence sought there, like that AHS obtained here, does not fall within an exception under *Western States* and to consider it to assess ACERA board members' motives would entail an inquiry that is beyond the limited scope of review in a mandate action.  (*SJ LAFCO,* at p. 171.)

AHS also uses language about ACERA working with County "behind the scene," refers to the emails as "back-channel communications" and faults ACERA for "not includ[ing] the backchannel communications . . . as part of the record before the ACERA board."  If it is claiming the County's communications with ACERA outside AHS's presence were procedurally improper, the argument also fails.  AHS cites no authority suggesting there is anything improper about ex parte communications in quasi-legislative proceedings like those here.  (Cf. Gov. Code, §§ 11425.10, subd. (a)(8) and 11430.10 [prohibiting ex parte communications in state agency *adjudicative* proceedings].)  Indeed, ACERA proffered evidence with its reply that AHS also communicated directly with ACERA by email without copying representatives of the County or other participating employers.

Finally, if AHS means that ACERA "abused its discretion by breaching its fiduciary duties" because it considered the County's interests in making the decision, again, we disagree.  While ACERA has a fiduciary duty to its members that takes precedence over any other duties (Cal. Const. art. XVI, § 17, subd. (b)), that does not preclude it from considering how the administration of the system will affect the interests of participating employers, including the County, or their employees as a case cited by AHS makes clear.  In *Bandt, supra,* 136 Cal.App.4th 140, the Fourth District rejected the argument of two retired members of a county retirement system that the board could not consider potential economic effects on the county and

its employees that would have resulted if it had not taken the steps it did. (*Id*. at p. 159.)[11]

In this case, similarly, ACERA's primary obligation to its members does not prohibit it from considering the interests of the participating employers, including the County, and of the ACERA members who work for them. Indeed, AHS asked it to consider, and it did consider at length, the claim that the methodology it was using was unfair to AHS and its employees. The fact that ACERA considered the County's point of view and ultimately disagreed with AHS does not prove otherwise. Thus, we agree with the trial court that it was not an abuse of discretion for the "Board's members [to] take into account the interests of the County, which after all is also a participating employer." The emails show that the County communicated its point of view to ACERA, and the record shows the County's point of view was aired fully in meetings at which AHS participated. The County's email communications

---

[11] In *Bandt,* the Fourth District addressed a situation in which the county had increased the pension benefits for members by $1.1 billion, causing a corresponding increase in the unfunded liabilities of the pension fund. (*Bandt, supra,* 136 Cal.App.4th at pp. 143-144.) To offset the increased liability, the county decided to issue pension obligation bonds in the amount of $550 million and the retirement board agreed to use those funds to reduce the unfunded liability. (*Id*. at p. 144.) It asked the retirement board to provide an interim valuation to take into account that $550 million pay down of the unfunded debt and to lengthen the amortization period for the debt from 10 to 15 years, with the result of decreasing the county's annual contribution the following year. (*Id*. at pp. 144, 147-148) The retirement board agreed, but two retired members cried foul. (*Ibid*.) They sued alleging that by performing the interim valuation, the board had violated a constitutional duty to maximize the amount of money in the pension fund in the short run. (*Id*. at pp. 144-145.) The court rejected the petitioners' argument that the board was prohibited from considering the interests of the county and the county's employees in making its decision. (*Ibid*.)

with ACERA do not demonstrate any procedural impropriety or other abuse of discretion.

### 4. *The Trial Court Did Not Abuse Its Discretion in Denying AHS Leave to Amend to Assert a New Breach of Fiduciary Duty Claim Before Granting Summary Judgment.*

AHS contends that even if a "stand-alone formal cause of action for breach of fiduciary duty were required" for it to pursue [a breach of fiduciary duty] claim instead of the writ of mandate claim it asserted, the trial court should have allowed it to amend its pleading. We review decisions on motions to amend for abuse of discretion. (*Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1147.) " 'On appeal the trial court's ruling will be upheld unless a manifest or gross abuse of discretion is shown.' " (*Ibid.*) As our high court has stated, "An abuse of discretion by the trial judge in making procedural rulings will never be presumed, but must appear affirmatively from the record." (*Meyer v. State Bd. of Equalization* (1954) 42 Cal.2d 376, 387.) No such abuse of discretion has been shown here.

AHS did not raise the issue of amending the complaint (for a fourth time) until the summary judgment hearing was held, which was more than three years after it filed the action. It did not seek leave to amend in its memorandum in opposition to the motion. At the hearing, AHS's counsel mentioned the subject only in passing and did not make clear what cause of action it sought to amend or how it proposed to amend it. The trial court suggested it was "pretty late down the road here to request leave to amend at the hearing on summary judgment on a third amended petition." Indeed, it was.

Although amendments are to be liberally allowed, there is no basis to complain about the denial of AHS's vague, last-minute request at the

36

summary judgment hearing. As this court has stated, "In spite of this policy of liberality, a court may deny a good amendment in proper form where there is unwarranted delay in presenting it." (*Fair v. Bakhtiari, supra,* 195 Cal.App.4th at p. 1147; see, e.g., *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486-487 [no abuse of discretion where no explanation for delay]; *City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1564 [no basis to complain about denial of request to amend where party waits 18 months to attempt amendment, after trial has commenced, and no excuse offered].) Here, AHS failed even to present "a good amendment in proper form," much less a cogent reason for its delay in seeking amendment.

After its somewhat cryptic reference to amendment at the summary judgment hearing, AHS's counsel did not raise the subject again during the hearing. Nor did it request to submit a supplemental brief on the issue or file a formal motion to amend after the ruling. Instead, it chose to stand on the Third Amended Petition and appeal from the judgment. While the absence of prejudice to the other side can result in a determination that a denial of a motion to amend was an abuse of discretion, here the tardy and minimalist way in which AHS raised the issue left the record barren of evidence regarding relevant factors such as prejudice.

Assuming (despite the lack of clarity) that AHS intended to amend the Petition to permit addition of a common law fiduciary duty claim based on allegations that the ACERA Board's decisions were "pretextual," there was no discussion at the summary judgment hearing of what it would have meant at that stage of the case to reopen it to allow such a claim. Had AHS raised the issue in a motion to amend or in its brief in opposition to summary judgment, the parties would have developed a record regarding whether amending would require that discovery be reopened or whether ACERA would

37

otherwise have been prejudiced by the addition of that new theory three years into the case.[12]

On this record, no abuse of discretion has been shown.

## II.

### *AHS Has Failed to Show the Trial Court Erred in Granting Summary Judgment Against It on Its Claim Against ACERA for Breach of the Covenant of Good Faith and Fair Dealing.*

AHS contends triable issues of material fact preclude summary adjudication of its cause of action for breach of the covenant of good faith and fair dealing. The trial court rejected AHS's claim on legal grounds based on facts not in dispute. AHS challenges its reasoning. We apply de novo review.

"The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" (*Guz v. Bechtel Nat., Inc.* (2000) 24 Cal.4th 317, 349.) A claim for breach of the implied covenant of good faith and fair dealing requires the existence of a contract, whether express or implied. (See *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031-1032 ["The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. [¶] . . . [¶] [T]here is no obligation to deal fairly or in good faith absent an existing contract"].)

---

[12] On appeal, AHS contends it "had no reason to bring a separate cause of action for breach of fiduciary duty" because its complaint "had been reviewed, and found adequate, by Judge Massullo" in connection with ACERA's demurrer and motion to strike. But a trial court's decision on a pleading motion does not bind the court on summary judgment "[e]ven when the same legal issue is presented." (*Aerojet-General Corp. v. Commercial Union Ins. Co.* (2007) 155 Cal.App.4th 132, 139, fn. 6.)

Further, it is well established that "an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55.) " 'It is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. [Citations.] . . . [¶] . . . [¶] We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms. [Citations.] "The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract 'an implication . . . should not be made when the contrary is indicated in clear and express words.' [Citation.] . . . [¶] As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. *And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.*" ' " (*Id.* at p. 56, quoting *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373-374.)

In June 2007, ACMC, AHS's predecessor, entered into an inter-agency agreement (the agreement) with ACERA. The stated purpose of the agreement was to "outline[] policy-level agreements" between ACMC and ACERA "so that both organizations can correctly meet their respective responsibilities in a timely fashion." Under the heading "Term and

39

Modification" the agreement provided as follows: "The term of this Agreement shall commence on the date set forth below ([June 29, 2007]) and continue for three years. It comprises the entire contract between ACMC and ACERA and describes the inter-organizational processes between the parties. Any waiver, modification or amendment of any provision of this Agreement will be effective only if in writing and signed by the parties."

With respect to funding and contribution rates, the agreement provides, in part, as follows: "Contributions are determined annually following the completion of the Actuarial Valuation and Review performed by ACERA's retained actuarial consultant . . . [¶] The actuary submits a draft report of the valuation findings to ACERA prior to its final report and will be open to suggested changes in the draft report as proposed by ACERA or employers. [¶] The draft report is presented in an open meeting and the actuary will receive comments from the employers and the public. Ultimately the Board will adopt the relevant assumptions as recommended by the actuary and commented on by the interested parties. ACMC is invited to participate in the actuarial process."

The agreement also makes clear the methodology ACERA would apply in setting employer contributions. It states, "*Employer contributions are based on a percentage of payroll* and are exclusive of age of entry." (Italics added.) Further, each of the employer handbooks on which AHS relies to establish an implied agreement also makes clear that the percentage of payroll method will be used to determine employer contribution rates. For example, the 2009 version states, "The funding objective of the pension plan is to establish employee and Participating Employer contribution rates that *will remain level over time as a percentage of payroll*, unless plan benefit provisions are changed." (Italics added.) In a section entitled, "Participating

40

Employer Contribution Rates," after stating that each year ACERA provides written notice to participating employers of contributions rates for the upcoming year, states unequivocally, "*Employer contributions are based on a percentage of payroll* and are exclusive of age of entry." (Italics added.) The 2013 handbook states, "Participating Employer contribution rates are set annually and can vary from year-to-year. Rates depend on the level of established benefits, rate of return on investments, and the cost of administering benefits. [¶] . . . [¶] *Employer contributions are based on a percentage of payroll* and are exclusive of age of entry." (Italics added.) Similar statements are made in the handbooks for 2014, 2015 and 2018.

Turning to AHS's contention that it had an agreement with ACERA upon which a claim of breach of the implied covenant of good faith can be based, we make the following observations. It is undisputed that the Inter-Agency Agreement provides that it "shall commence on [June 29, 2007] and continue for three years" and that any modification or amendment of it "will be effective only if in writing and signed by both the parties." AHS did not proffer evidence denying the agreement or its terms; indeed, it submitted the agreement as part of its evidence with its opposition to ACERA's motion for summary judgment. Rather, its argument is that "the agreement was extended by the parties' conduct." In particular, it contends that AHS and ACERA continued performing consistent with the Inter-Agency Agreement, as memorialized in the ACERA employers' handbook, and as evidence it relies on excerpts from the ACERA Participating Employers' Handbooks for years 2009, 2013-2015 and 2018. It points to references in the handbooks to "each Participating Employer's Inter-Agency Agreement with ACERA" for the dates those employers' "transmittal files are due."

41

AHS does not contend, however, that the parties fulfilled the agreement's requirement for amending or modifying it by executing a writing signed by both parties. And neither of the California cases it cites for the proposition that under California contract law, a contract may be implied from the conduct of the parties—*British Motor Car Distrib., Ltd. v. New Motor Vehicle Board* (1987) 194 Cal.App.3d 81 and *Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc*. (2011) 194 Cal.App.4th 623—addressed a contract with a clause requiring modifications or amendments to be in writing and signed by the parties. AHS has provided no argument or authority directed to the trial court's holding that a party to such a contract may not assert the contract was extended by conduct in direct contradiction to that contract's requirement that amendments be in writing and signed. On the other hand, the case cited by ACERA and the trial court, *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, while supporting the general proposition that an alleged oral or conduct-based agreement cannot be used to vary the terms of written agreement, does not address the specific issue of extending a contract with a requirement that amendments be in writing and signed, either.

AHS has not persuaded us that the trial court erred in concluding the lack of an agreement precluded it from asserting an implied good faith covenant claim, and we are not required to find authority or construct an argument for or against it. However, because neither side has provided us with authority on point, we will not rest our decision on that ground.

We turn now to the second error AHS contends the trial court made in rejecting AHS's bad faith claim—its conclusion that AHS's implied covenant claim would improperly vary the terms of the agreement. AHS alleges that

42

ACERA "refus[ed] to reconsider AHS's request for a modification of the method for assessing unfunded pension liabilities" and "acquies[ed] to the County's interests to ensure that the County is subsidized by AHS and that the County's costs are artificially lowered." By doing these things, AHS alleges, ACERA "unfairly interfered with AHS's right to receive the benefits of the contract with ACERA."

The problem with AHS's good faith covenant theory is this. Assuming there is an express or implied contract between AHS and ACERA based on the Inter-Agency Agreement, the employee handbooks and the parties' conduct, it is an agreement that ACERA *will base employer contributions "on the percentage of payroll" method*. All the documents on which AHS relies as evidence of the agreement *and* the conduct of the parties from the time AHS became a participating employer in ACERA until the dispute between them arose reflects that ACERA's application of this methodology was a term of the agreement. "The covenant of good faith and fair dealing cannot impose substantive terms and conditions beyond those to which the parties actually agreed." (*Guz v. Bechtel Nat., Inc.*, *supra*, 24 Cal.4th at p. 317.)

AHS's assertion that ACERA had an obligation to *consider changing* the percentage of payroll methodology to some other methodology, such as the percentage of liability method AHS preferred, is not supported by the contract's express terms. The Inter-Agency Agreement and all the handbooks make unequivocally clear that ACERA *will apply* that methodology. Not only did the parties' contract, assuming there was one, expressly provide for the use of that methodology, it did not require ACERA to consider changing that methodology. As the trial court put it, the agreement "left entirely to ACERA's discretion the selection of actuarial methodologies and the conduct

43

of additional studies, and [AHS's] implied covenant claim would improperly vary the terms of that Agreement to limit or eliminate that discretion."[13]

In short, ACERA had no contractual obligation to consider AHS's request to change the percentage of payroll methodology. The fact that it did so was within its discretion. But because it had no contractual obligation to consider the request at all, as a matter of law ACERA cannot have breached the duty of good faith and fair dealing by failing to consider the request in the particular manner asserted by AHS. AHS's assertions that ACERA acted unfairly to appease the County in denying its request to change the percentage of payroll methodology fail as a matter of law to create triable issues concerning its claim for breach of the implied covenant of good faith and fair dealing. (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 39.)

## DISPOSITION

The judgment is affirmed. ACERA is entitled to costs on appeal.

---

[13] AHS points to language in the Inter-Agency Agreement that provides for a meeting at which participating employers may suggest changes to the actuary's draft report "of the valuation findings." But valuation is distinct from the methodology involved in determining contributions. According to the undisputed evidence, the actuarial valuation Segal performs annually for ACERA is " 'a procedure actuaries use to help pension funds establish the amount a plan needs to collect in order to meet the fund's current and future payment obligations. One technique used is to estimate the current (present) value of the future benefits a pension plan should expect to pay. Once this number is calculated, *then* the contribution amounts necessary to cover those benefit costs can be computed.' " (Italics added.) Although the valuation can affect the magnitude of employer contributions, the Inter-Agency agreement's invitation to employers to present comments on the valuation report cannot reasonably be understood as an invitation to request a wholesale change in the methodology for determining employer contributions that the agreement unequivocally says ACERA will apply.

_____
STEWART, P.J.

We concur.


_____
RICHMAN, J.


_____
MILLER, J.


*Alameda Health System v. Alameda County Employees Retirement Assn.*
(A165587)

Trial Court:San Francisco County Superior Court

Trial Judge:          Hon. Ethan P. Schulman

Counsel:

Renne Public Law Group, Arthur A. Hartinger, Linda M. Ross, Ryan P. McGinley-Stempel and Steve Cikes, for Plaintiffs and Appellants.

Nossaman, Peter H. Mixon, Ashley K. Dunning and Aalia Taufiq, for Defendants and Respondents.